In re MARUKO, INC., Debtor.

Nobutsugu AINO; Hiroshi Aoyama; et al., Plaintiffs,

v.

MARUKO, INC., Defendant.

Bankruptcy No. 91–12303–A11.
Adv. No. 95–90485–A11.

United States Bankruptcy Court, S.D. California.

Sept. 30, 1996.

---

Arnold M. Quittner, Pachulski, Stang, Ziehl & Young, P.C., Joseph A. Eisenberg, P.C., Adrienne M. Coffin, Jeffer, Mangels, Butler & Marmaro L.L.P., Los Angeles, CA,

Office of the U.S. Trustee, San Diego, CA, for Reorganized Debtor/Defendant.

Theodore W. Graham, Jeffrey Garfinkle, Brobeck, Phleger & Harrison, San Diego, CA, for Plaintiffs.

## MEMORANDUM DECISION

LOUISE DeCARL ADLER, Chief Judge.

Plaintiffs Nobutsugu Aino, et al. ("Aino"), certain former co-owners of Beverly Plaza Shopping Center, Doubletree Rancho Bernardo, High Bluff Office Building, Holiday Inn Civic Center, Kauai Resort Hotel, Ptarmigan Inn, Sports Arena Travelodge and St. Tropez Hotel (the "Cash Co-Owners") have moved for summary judgment in their complaint for declaratory relief filed against Maruko, Inc.

## FACTUAL SUMMARY

■ A motion for summary judgment may be granted if upon consideration of the pleadings, depositions and declarations, the court is persuaded that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. F.R.C.P. 56. Although Maruko's opposition lists six pages of "disputed issues of fact", upon a closer examination, many of the claimed factual disputes are really legal questions.[1] Further, although Maruko disputes certain facts, the Court finds many of the disputed facts to be non-material. Materiality of disputed facts is examined when determining whether summary judgment is appropriate. As stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202 (1986):

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted. (Italics in original).

The following factual summary sets out each undisputed fact which the Court believes is material to the decision of this motion for summary judgment.

### A. Pre–Petition History

Prior to filing its chapter 11 case in Japan, Maruko was in the business of developing commercial properties all over the world. It divided these properties into co-ownership interests and then sold those co-ownership interests to Japanese nationals. The Japanese nationals would then lease back their interests to Maruko through simultaneously executed agreements called "APAC contracts." These leasebacks or APAC contracts guaranteed fixed monthly rental payments to the co-owners.

In most cases, Maruko's subsidiary, General Lease, Inc. provided financing for the purchase of the co-ownership interests. However, the Cash Co–Owners who are the plaintiffs in this action, did not finance their purchases through General Lease. Most of these Cash Co–Owners obtained independent financing from various Japanese institutions. Despite the fact that Maruko has sold the properties in which these plaintiffs have co-ownership interests, Maruko has not, for the most part, repaid the plaintiffs their aliquot share.

### B. Chapter 11 Plan in U.S. Case

On August 29, 1991 Maruko filed a reorganization case in Japan. Maruko's Japanese case is still pending before the Tokyo District Court. On October 30, 1991 Maruko commenced a separate chapter 11 case for the same entity in the United States to effect reorganization of all of its non-Japanese real property assets.

Sometime in December 1991 in the Japanese reorganization case, Maruko canceled its leases with all of its co-owners and notified them accordingly. Although the exact dates are somewhat unclear, it appears that

---

**1.** *See,* for example, Resp. of Maruko, Inc. filed Mar. 20, 1996, p. 3, ¶ 3–6.

the co-owners who financed through General Lease (the "General Lease Co–Owners") filed cancellation claims in February, July and October 1993 and February 1994. (*See* Exhibit "A" to Decl. of Hideyuki Sakai, dated Mar. 18, 1996 and Decl. of Mikio Moriga filed May 29, 1996 at 4:7–15) The Cash Co–Owners filed cancellation claims in April 1994. The defendant has not disputed plaintiffs' assertion that cancellation claims from *some* of the approximately 800 former Maruko co-owners had been filed in the Japanese case by July 1993.

Maruko filed its initial proposed plan of reorganization in the U.S. case during the Spring 1993. There were subsequent amendments. The amendment contained in the plan of reorganization dated August 16, 1993 added a new Class 4E purporting to treat "claims of Japanese domiciled creditors arising from rescission or for damages arising from the purchase or sale of their investment." (Plan of Reorganization dated Aug. 16, 1993, at 18:23–25) No distribution was to be made to Class 4E claimants. The amended disclosure statement dated August 16, 1993 explained the reason for the amendment:

> The Japanese Investors' claims were scheduled in that amount [$39 million]. They were served with notices of the bar date and the scheduling of their claims and the fact that, if they disagreed with their claims as scheduled, they had to file a proof of claim or be forever barred. It is a condition to participating as a Class 4B Creditor [claims of Japanese domiciled creditors arising out of lease rejections] in the U.S. Plan that such Japanese Investor does not pursue a claim in either the U.S. Proceeding or the Japanese Proceeding for rescission or damages from the purchase of such Investor's investment. To the extent that a Japanese Investor elects to pursue such a claim, the Investor shall be classified in Class 4E. The holders of Allowed Claims in Class 4E are subject to subordination under Code section 510(b) and will receive no distribution in the U.S. Plan.

(Disclosure Statement in Support of Debtor's Plan of Reorganization dated Aug. 16, 1993, at 19:22–28, 20:1–6.)

The Japanese co-owners strenuously objected to this added provision as grossly discriminatory and violative of the best interest of creditors test. (Obj. to Adequacy of Debtor's Disclosure Statement in Support of Debtor's Plan of Reorganization dated Aug. 16, 1993 filed Aug. 20, 1993.) Negotiations ensued between the Japanese co-trustees and the Yoyogi law firm representing a large number of co-owners (both General Lease Co–Owners and Cash Co–Owners). On November 2, 1993 the Japanese co-trustees and Yoyogi signed a "memorandum of understanding" in which Maruko agreed to delete the following language in the plan:

> Class 4B Claimants may not pursue Claims in the Japanese Proceeding for lease rejection or termination, rescission, or damages from the purchase of their investment or any other Claims.

(Mem. of Understanding, dated Nov. 2, 1993 at 1.)

Instead the following language was to be inserted in the proposed plan:

> Class 4B Claimants may assert claims in the Japanese Proceeding. The plan shall have no effect on the rights of Class 4B Claimants to assert claims in the Japanese Proceeding nor shall it have any effect on the rights of Co–Trustees to object to such claims in the Japanese proceeding, provided, however, that in the event the Japanese Court admits and allows the claims of Class 4B Claimants asserted in the Japanese Proceeding, an amount equivalent to any distributions that Class 4B Claimants receive on account of their claims in the U.S. Proceeding under the plan shall be deducted from their distributions in the Japanese Proceeding.

(Mem. of Understanding, dated Nov. 2, 1993 at 1.)

At the confirmation hearing held November 29, 1993 the co-owners withdrew their objections and consented to plan confirmation based upon these amendments to the plan. The order confirming the plan entered February 3, 1994 inserted the agreed language provided in the Memorandum of Un-

derstanding and deleted Class 4E which subordinated co-owner claimants who had filed rescission claims.

## C. Section 363(h) Adversary Proceedings

In deciding this motion it is also important to review the history of the section 363(h) adversary proceedings filed by Maruko. In 1992, Maruko commenced 13 separate lawsuits to sell various syndicated properties free and clear of the interests of their co-owners pursuant to section 363(h) of the Bankruptcy Code. Each complaint contained the following typical provision:

Upon consummation of a sale of [the syndicated property], Maruko shall distribute to the Co-owners and to the estate the proceeds of the sale, less unreimbursed operating losses and costs incurred by Maruko on behalf of the Co-owners, and less the costs and expenses reasonably attributable to the sale, according to the interests of the Co-owners and of the estate, and subject to the prior satisfaction of all valuable liens, charges or encumbrances on the [syndicated property] (including liens, charges or encumbrances on the interests of Co-owners).

(*See*, for example, Compl. to Authorize the Sale by Debtor in Possession of Property Held in Co-Tenancy with Def. (Beverly Plaza Shopping Center), Adv. Case No. 93–90223 filed Feb. 9, 1992.)

The Cash Co–Owners did not answer or otherwise defend these complaints although other co-owners did. As a result of settlement discussions with objecting co-owners, stipulated judgments were entered against all co-owners which permitted Maruko to market these properties for sale free and clear of the co-owners' interests. As offers to purchase arose, Maruko would bring a motion to sell the property. When the sale closed, Maruko provided the co-owners with information concerning the proposed distribution of the sale of proceeds. (*See*, for example, Exhibits "E" and "F" to Decl. of Mikio Moriga in Supp. of Pls.' Reply filed Mar. 29, 1996.)

On or about April 26, 1994, the co-trustees of Maruko informed the Cash Co–Owners of the Beverly Plaza Shopping Center that despite the fact the property had been sold in September, 1993, since the Cash Co–Owners had filed cancellation claims in the Japanese proceeding, no further distribution would be made to the co-owners:

The property was sold in September, last year, and $5,000 was paid to you as a partial payment. Such payment was made on the assumption that said property belonged to you. However, you are trying to cancel the contracts thereafter through attorneys, and we consider that your assertion of cancellation of the contracts is inconsistent with the assumption above.

(Letter to Cash Co–Owners of Beverly Plaza Shopping Center from Hiroshi Okazaki, Shogo Abe and Shigeo Suetake dated Apr. 26, 1994.)

The declaration of Co–Trustee Sakai filed March 20, 1996 claims that the co-trustees had put the cancelling Cash Co–Owners on notice that "[f]rom and after the April 22, 1994 filing of the Co–Owners' complaint seeking rescission, no representation, promise or assurance was given by Maruko, or by me to the Yoyogi clients or to Moriga [the Cash Co–Owners' attorney], that the cash sale proceeds would be distributed to rescinding Cash Co–Owner." (Decl. of Hideyuki Sakai, at 21:24–7 and 22:1.) However, as to most of these properties, the evidence is clear that the Cash Co–Owners were promised otherwise.

Neither the motion to sell the Beverly Plaza Hotel (granted by order entered August 20, 1993) nor the motion to sell the Holiday Inn Civic Center (granted by order entered April 21, 1994) contained any language limiting the distributions to those co-owners who had filed either cancellation or rescission claims. Similarly, the motions filed in August 1994 to sell the Doubletree Rancho Bernardo and High Bluff Office Building and in September 1994 to sell the Kauai Resort expressed no intention to withhold distribution of proceeds to the Cash Co–Owners because of their cancellation claims filed in the Japanese proceeding. The orders approving these sales were silent as to any intention to withhold proceeds. Only in

the June 1995 motion to sell the Sports Arena Travelodge, the July 1995 motion to sell the St. Tropez Hotel and the October 1995 motion to sell the Ptarmigan Inn, did Maruko state:

> Maruko does not intend to make any distributions to any Cash Co–Owners who has [sic] a claim or litigation pending in Japan seeking rescission-type relief with respect to such Cash Co–owner's Co-tenancy Interests (a 'Rescission Cash Co–Owner').

(*See*, for example, Maruko's Mot. to Sell Sports Arena Travelodge at 11–12:25–4.)

This action caused this complaint for declaratory relief to be filed against Maruko.

## ISSUES

I. Does Maruko's confirmed chapter 11 plan require immediate distribution to the Cash Co–Owners?

II. Does section 363(j) require immediate distribution to the Cash Co–Owners?

III. Is there any equitable justification for withholding distribution to the Cash Co–Owners?

## DISCUSSION

### *I. Does Maruko's confirmed chapter 11 plan require immediate distribution to the Cash Co–Owners?*

A close reading of Maruko's confirmed chapter 11 plan leads to the surprising conclusion that the plan nowhere promises to distribute proceeds to the co-owners. The plan only deals with Maruko's co-owned shares in the various real properties and promises Class 4B claimants a 6% payment on their lease rejection damage claims which is to be paid out of Maruko's share of proceeds from asset sales or refinancing.

■ However, the confirmed plan has to be considered in the context of other events which occurred in the case. Prior to confirmation of the plan, the Court entered stipulated section 363(h) judgments which required distributions to co-owners upon the sale of each property. Those judgments drew no distinction between the co-owners based on whether they had filed cancellation claims in Maruko's Japanese reorganization case. These stipulated judgments entered in advance of the confirmation of Maruko's plan, when viewed against the plan's silence on the issue of distribution to co-owners, provide ample justification to infer that immediate distribution to all co-owners was required.

Further, if this were not true, then the confirmed chapter 11 plan preferred some Japanese claimants over others without disclosing the preferred treatment. Those co-owners who had not filed cancellation or rescission claims would receive their proceeds in the U.S. case while those who had filed such claims would have to await conclusion of the Japanese reorganization case. This disparity in treatment obviously would have affected Class 4B's voting on Maruko's plan.

■ A chapter 11 plan is a contract between the debtor and its creditors in which general rules of contract interpretation apply. *Hillis Motors, Inc. v. Hawaii Auto Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993); *C.F. Brookside, Ltd. v. Skyview Memorial Lawn Cemetary (In re Affordable Housing Development Corp.)*, 175 B.R. 324, 329 (9th Cir. BAP 1994). As with all contracts, ambiguities which exist in a chapter 11 plan are to be construed against its drafter. *In re Harstad*, 155 B.R. 500, 510 (Bankr. D.Minn.1993), *aff'd*, 39 F.3d 898 (8th Cir. 1994). If Maruko had intended to distinguish between the co-owners and to withhold distribution to those who filed cancellation or rescission claims, Maruko should have disclosed this in the plan. *Heritage Hotel Ltd. Partnership I v. Valley Bank of Nev. (In re Heritage Hotel Partnership I)*, 160 B.R. 374, 378 (9th Cir. BAP 1993), *aff'd*, 59 F.3d 175, 1995 WL 369528 (9th Cir.1995); *Hay v. First Interstate Bank of Kalispell*, N.A., 978 F.2d 555, 557 (9th Cir.1992). Otherwise, the court must assume that the debtor intended to honor its pre-confirmation promises made to the co-owners in the stipulated section 363(h) judgments to distribute proceeds to all of them upon the sale of their properties.

### *II. Does section 363(j) require immediate distribution to the Cash Co–Owners?*

There is a paucity of case law discussing

timing of distributions under section 363(j).[2] However, in reviewing the reported cases, the statute, the legislative history and various treatises, the court concludes that the drafters of the Bankruptcy Code intended the distribution under section 363(j) to be immediate.

Maruko's opposition to this motion for summary judgment focuses on the "fundamental inconsistency" between the Cash Co-Owners filing of cancellation claims or rescission claims in the Japanese reorganization case while seeking immediate distribution of their co-owners' interest in the net sale proceeds under section 363(j). Maruko argues that should the co-owners succeed on their claims in the Japanese reorganization case, the effect of their success would be to "deny their status as co-owners". (Maruko Resp. filed Mar. 20, 1996, at 7:3–4.)

■ Section 363(j) is linked to section 363(h) and cannot be read in isolation. Although section 363(j) does not specify the date as of which a co-owner's interest in property is determined, section 363(h) guides us to look to the petition date. Specifically, section 363(h) permits the trustee to sell both the estate's interest and the interest of any co-owner "in property in which the debtor had, *at the time of the commencement of the case,* an undivided interest...." (emphasis added).[3] The sale can only occur if, among other things, sale of the estate's interest would realize significantly less than the sale of the estate's interest together with the co-owner's interest. *Schwaber v. Reed, (In re Reed),* 940 F.2d 1317, 1323 (9th Cir.1991). If

this contention were disputed, in order to make the finding required by section 363(h)(2), the court would have to determine the nature of the debtor's ownership interest on the petition date and place a value upon its sale. By negative inference, the co-owner's interest on the petition date is what would be left and section 363(j) requires that the co-owner receive the proceeds allocable to its interest. *See,* Laurence D. Cherkis & Beth M. Polebaum, *Dealing With the Debtor in, Real Estate and the Bankruptcy Code 1985,* at 259 (Real Est. L. and Practice Course Handbook Series No. N4-4449, 1985); Editor's Comment to Section 363(h), *Norton Bankruptcy Law and Practice Guide 2nd* (1994–95).

■ Although neither section 363(j) nor its legislative history states that the distribution must occur immediately, the court believes this was probably intended. First, the statute is phrased in mandatory terms. It mandates that after the sale, the trustee must distribute the proceeds to the co-owners and the estate. The trustee is provided with a point in time and directed to distribute to all co-owners simultaneously. The plain language does not support Maruko's position that the debtor can distribute its own share and withhold the co-owners' share for several years.

Second, the legislative history supports the conclusion that distribution must occur immediately because the purpose of section 363(j) is to protect the co-owner's interest in the event the estate sells to someone other than the co-owner. H.R.Rep. No. 595, 95th

**2.** Section 363(j) provides:

After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners and of the estate.

**3.** Section 363(h) in its entirety provides:

Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the com-

mencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

Cong., 2nd Sess. 177 (1977), *reprinted in* 1978 U.S.C.A.A.N., 593, 6137–38. Because of Maruko's actions, the co-owners are not being protected since they are now deprived of the property and cannot use the proceeds to pay their loans.

Finally, immediate distribution is required to make section 363(h) constitutional. Section 363(h) has been criticized as violating the "Takings Clause" of the Constitution because it sells the non-debtor co-owners' property interests.[4] However, immediately distributing the co-owners' portion of the proceeds avoids offense to the Constitution by providing the co-owners with their expectation of compensation. *See, In re Bernier,* 176 B.R. 976, 989–996 (Bankr.D.Conn.1995).

Assuming for argument's sake, that Maruko is correct that the co-owners' success on their cancellation or rescission claims negates their status as co-owners, these contemplated future events should not excuse compliance with section 363(j). The date for measuring co-ownership is the petition date. By virtue of this court entering stipulated judgments in the section 363(h) adversary complaints, this court necessarily determined the co-owners' proportional interests on the petition date.

### III. Is there any equitable justification for withholding distribution to the Cash Co–Owners?

Although it is not clearly articulated, Maruko appears to be arguing that equitable reasons should cause the court to deny the grant of summary judgment. The Declaration of Hideyuki Sakai claims,

The Yoyogi cash co-owners first filed claims suggesting rights of rescission of the purchase and sale agreements in the claims filed in the Tokyo District Court ... but those claims were ambiguous and it was not until April 22, 1994 when the Yoyogi cash co-owners first filed their complaints in the Tokyo District Court ... that it became clear that the Yoyogi cash co-owners were asserting claims based upon the entire purchase price under the theories of (i) *Torikeshi* (rescission based upon fraud), ....

(Sakai Decl. at 17:17–25.)

Maruko argues that if the Tokyo District Court grants rescission of the original sale/leaseback agreements for fraud, the claims of the co-owners are subject to subordination under section 510(b).[5] Maruko further argues that if the Tokyo District Court permits rescission for fraud, Maruko would be in the unenviable position of having to pursue those co-owners who had previously improperly received a portion of the net sales proceeds in the U.S. case because of their status as co-owners. Because of the difficulty Maruko would have in pursuing recovery of these funds from Japanese nationals, Maruko contends that it should be permitted to withhold distribution to these rescinding co-owners until the Tokyo District Court decides the actions filed there.

■ This free-floating appeal to the court's equitable powers contains a number of flaws. First, it is highly doubtful that section 510(b) could be invoked to attack a transaction occurring outside of the U.S. To fall within section 510(b) a "security" must be involved. Section 101(49)(A) defines a security as including an "investment contract or certificate of interest ... required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement." The Securities Act of 1933 and the regulations adopted to implement it state that investment contracts sold to non-U.S. citizens by a non-U.S. corporation are not required to be the subject of a registration

---

**4.** The Fifth Amendment to the United States Constitution provides in relevant part: "... nor shall private property be taken for public use, without just compensation (the 'Takings Clause')".

**5.** Bankruptcy Code section 510(b) permits subordination of claims arising from the sale of a "security", providing:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor ... [or] for damages arising from the purchase or sale of such security ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security ....

statement filed with the S.E.C. *See,* 17 C.F.R. § 230.901 (1996).

 Assuming for argument's sake that section 510(b) did apply, Maruko's confirmed plan did not provide for the subordination of any claims. The order confirming the plan is final and that plan is binding upon Maruko. As recited above, the August 16, 1993 version of the disclosure statement for Maruko's plan of reorganization reveals the debtor was aware that rescission claims had been filed by some co-owners. The ensuing Memorandum of Understanding which amended Maruko's plan preserved the rights of co-owners to file the rescission claims in the Japanese case. Maruko cannot seek to subordinate any claims of the Cash Co–Owners since entry of the confirmation order "precludes the raising of issues which could or should have been raised during the pendency of the case." *Heritage Hotel Ltd. Partnership I v. Valley Bank of Nev. (In re Heritage Hotel Partnership I),* 160 B.R. 374, 378 (9th Cir. BAP 1993), *aff'd,* 59 F.3d 175, 1995 WL 369528 (9th Cir.1995).

 Finally, Maruko need not be concerned with recovering amounts impermissibly paid to co-owners in the U.S. case. As previously explained, Maruko's Japanese case and Maruko's U.S. case are separate chapter 11 cases for the *same* entity. Maruko has not demonstrated that the Tokyo District Court is unable or unwilling to make adjustments to the amount of the Cash Co–Owners' claims in the Japanese case based on previous distributions they may have received for their ownership interests in the U.S. case. This court reposes the highest confidence in the ability of the Tokyo District Court to fairly adjudicate these respective parties' rights.

### CONCLUSION

The debtor availed itself of section 363(h)'s powers and persuaded the co-owners to stipulate to judgment with the promise they would be receiving their allocable share. The debtor confirmed a plan of reorganization which is partially funded with its allocable share of these sale proceeds. In the Memorandum of Understanding Maruko clearly was aware that the co-owners' rescis-

sion claims had been and would be filed in Japan and the confirmed plan contains no penalty for their so doing. Section 363(j) mandates immediate distribution of the Cash Co–Owners' allocable shares. It is inequitable at this point to penalize co-owners who filed rescission claims by withholding distribution.

For the foregoing reasons, summary judgment should be entered in favor of the plaintiffs and against the defendant and a declaratory judgment shall enter requiring Maruko to distribute to the Cash Co–Owners their shares of the net sale proceeds. Counsel for the Cash Co–Owners shall prepare an order in conformance with this Memorandum Decision within ten (10) days from entry hereof.