In re THE BENNETT FUNDING
GROUP, INC., Debtors.

Richard C. BREEDEN, Trustee for
the Bennett Funding Group,
Inc., et al., Plaintiff,

v.

Patrick R. BENNETT, et al., Defendant.

Bankruptcy No. 96–61376.
Adversary No. 96–70154.

United States Bankruptcy Court,
N.D. New York.

Oct. 9, 1997.

Simpson, Thacher & Bartlett, New York City, George M. Newcombe of counsel, for Plaintiff.

Backenroth & Grossman, L.L.P., New York City, Robert E. Grossman, for Defendant.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Before the Court is the motion (the "Motion") of the chapter 11 trustee (the "Trustee") of the jointly administered and substantively consolidated estates of The Bennett Funding Group, Inc. ("BFG"), Bennett Receivables Corporation, Bennett Receivables Corporation II and Bennett Management and Development Corporation ("BMDC") for " a) partial summary judgment on the [Trustee's] claim that the sale of the Hotel Syracuse on or about March 1, 1996, and the modifications to BMDC's notes and mortgages on the Hotel Syracuse attendant therewith, was a fraudulent conveyance and should be avoided; b) turnover to the Trustee of title to the Hotel Syracuse and all profits and revenues generated by the Hotel since March 1, 1996; c) a preliminary injunction prohibiting defendant Allegro Property and Finance, Inc. ("Allegro") from transferring and/or disposing of any of the profits and revenue generated by the Hotel Syracuse since March 1, 1996; or, in the alternative, an order of attachment against the assets of Allegro located in New York; and d) an order requiring Allegro to provide an accounting of all profits and revenue generated by the Hotel Syracuse since March 1, 1996." *See Trustee's Notice of Motion, filed October 2, 1996 (the "Notice of Motion"), at p. 2.*

On June 6, 1996, the Trustee filed a complaint (the "Complaint") containing allegations illustrative of what this Court has previously characterized as a "financial superweb" of dealings involving, among others, companies owned and/or controlled by the Bennett family of Syracuse, New York, including all of the above-captioned debtors, as well as individual members of the Bennett family (collectively, the "Bennett Group"). On August 30, 1996, the Trustee amended the Complaint by filing a First Amended Adversary Proceeding Complaint (the "Amended Complaint").

In the Amended Complaint, the Trustee alleges, and, generally speaking, Allegro does not dispute that

[t]he Bennetts, either directly and with actual knowledge, or negligently and recklessly in their capacity as officers and directors of the Bennett Group companies, and aided and abetted by others, perpetrated or oversaw the perpetration of what the U.S. Securities and Exchange Commission ... has described as the largest Ponzi scheme ever carried out against individual investors and financial institutions in U.S. history. In breach of their statutory and common law duties to the Debtors, the Bennetts and others conducted or permitted to be conducted the affairs of the Bennett Group in a manner that resulted in their reaping, unlawfully and fraudulently, hundreds of millions of dollars in funds from investors and financial institutions, thereby exposing the Debtors to massive criminal and civil liabilities, penalties, sanctions, insolvency and bankruptcy, and seriously destroying their business reputation and goodwill. This nefarious scheme was carried out by various and sundry illegal, fraudulent and unauthorized activities including, among other things: assigning fictitious leases to investors; assigning multiple times the same leases; obtaining loans from financial institutions by pledging to them leases that had already been, or would thereafter be, assigned to investors; engaging in prohibited transactions with the pension and profit sharing plans of the Bennett Group; secretly paying related companies with investor funds to execute sham transactions designed to, among oth-

er things, provide the appearance of income to the Bennett Group companies; and promulgating false and misleading financial statements and securities offering documents in violation of the laws of the United States and of several states.

*See Amended Complaint,* ¶ *1.*

The Trustee's Amended Complaint asserts various causes of action against numerous individuals and entities alleged to have aided and abetted the Bennett Group in one fashion or another in perpetrating the fraud described above. The Trustee's cause of action against Allegro is factually predicated upon a complex series of transactions directly or indirectly affecting ownership and/or control of the real property and improvements thereon located at 500 South Warren Street in Syracuse, New York, commonly known as the Hotel Syracuse (hereinafter, the "Hotel"), which culminated in Allegro's effective acquisition of the Hotel. The Trustee essentially contends that the transfer of the Hotel to Allegro was facilitated by an adverse modification to BMDC's mortgage interest in the Hotel, as well as by an extinguishment or a reduction of loan receivables owing to BMDC, which constitute fraudulent transfers/conveyances of BMDC's property within the meaning of § 548(a) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (the "Code") and §§ 270–281 of the New York Debtor and Creditor Law ("NYD & CL").

The Trustee filed the Motion on or about October 2, 1996. Following several adjournments, oral argument was heard on February 27, 1997, and the matter was submitted for decision that same day.

**BACKGROUND AND ALLEGATIONS OF FACT**

*The Pre–Sale Obligations Owing to BMDC*

The Hotel is owned by Hotel Syracuse, Inc. ("HSI").[1] On October 26, 1990, HSI filed a chapter 11 bankruptcy petition in this Court. By Order dated June 18, 1993 (the "HSI Confirmation Order"), the Court confirmed HSI's Third Amended Plan of Reorganization (the "HSI Plan"), pursuant to which M.A. Bennett Associates, Ltd. ("MAB") purchased all of the stock of HSI. BMDC, however, actually funded the HSI Plan by effectively paying, or causing to be paid, a total of $10,658,880.04 (the "Acquisition Funds") to various entities which held claims against HSI's estate. On its books, BMDC treated the advancement of the Acquisition Funds as 1) a secured loan receivable in the principal amount of $8,000,000 owing from MAB, and 2) various unsecured loan receivables in the aggregate principal amount of approximately $2,600,000 owing from MAB. *See Affidavit of Manny A. Alas, Sworn to December 11, 1996 (the "Alas Affidavit"), submitted under cover of Declaration of James G. Gamble filed December 11, 1996, at* ¶¶ *6–8.*[2]

BMDC's treatment of $8,000,000 of the Acquisition Funds as secured stemmed from the fact that, prior to confirmation of the HSI Plan, BMDC had purchased an aggregate principal amount of $17,500,000 in secured claims against HSI's estate for approximately $4,000,000.[3] *See Allegro's Memorandum of Law filed October 21, 1996, at p. 2.* Pursuant to the HSI Plan, these secured claims were to be "recast and restructure[d]" into a single note in the principal amount of $8,000,000, secured by a sin-

---

**1.** The nature of HSI's interest in the Hotel is unclear from the record. It appears to be Allegro's position that HSI has a leasehold interest in, and not fee title to, the Hotel. The record suggests that HSI once leased the Hotel from one or more municipal agencies which took title to the Hotel as a condition of the Hotel being the beneficiary of industrial development financing. It is not clear to the Court whether, following HSI's bankruptcy, HSI acquired fee title to the Hotel. For the purposes of this Decision, it is unnecessary to determine the precise nature of HSI's interest in the Hotel, and, for simplicity's sake, the Court will refer to HSI as "owning" the Hotel.

**2.** The Trustee produced two unexecuted promissory notes from MAB to BMDC, each dated July 1, 1993, in the original principal amounts of $6,500,000 and $4,137,959, respectively. *See id., Exhibit E.*

**3.** It is unclear to the Court whether this $4,000,000 constituted part of the Acquisition Funds, and if so, why the unsecured debt owing to BMDC in connection with the Acquisition Funds was not approximately $6,600,000.

gle mortgage lien which was to be the only encumbrance against HSI's interest in the Hotel immediately post-confirmation. *See Exhibit B to Declaration of Schuyler G. Carroll, filed October 21, 1996.* The Trustee concedes that these secured claims were never recast nor restructured, but nevertheless asserts that immediately following confirmation of the HSI Plan, BMDC held a claim in the principal amount of $8,000,000 against HSI, secured by a first priority lien on the Hotel (the "$8 Million Obligation"). The Trustee further asserts that, pursuant to the terms of the HSI Plan, approximately $1,300,000 in accrued interest was due and owing on the $8 Million Obligation as of February 29, 1996, so that BMDC held a secured claim of approximately $9,300,000 as of that date.[4]

BMDC continued to fund the operation of the Hotel post-confirmation. From October 1994 to June 1995, BMDC made seven advances of funds to HSI, aggregating $3,121,-187.00 (collectively, the "Renovation Loans"), which appear to have been used to renovate the Hotel. During 1994, BMDC made three other advances to MAB and one to HSI, aggregating $1,635,025.00, which were recorded on the books of BMDC as having been made in exchange for preferred stock in MAB. *See id. at ¶¶ 9–11.*

Additional post-confirmation funding came from BFG, which, under its "Aloha Leasing" trade name, entered into a total of 80 lease transactions with HSI between June 1993 and December 1995, in connection with which it advanced to HSI funds and/or equipment having an aggregate value of $5,552.449.00. The first 16 of these leases (collectively, the "16 BMDC Leases"), entered into between June 1993 and September 1994, were consolidated into a single loan receivable owing

from HSI to BFG in the amount of $4,087,-653.82, which was transferred to BMDC in October 1994 through a series of accounting entries on the books of BFG and BMDC, respectively.[5] *See id. at ¶¶ 12–15.*

Thus, the Trustee asserts that, as of March 29, 1996, obligations totaling at least $20,803,865.82 (collectively, the "Pre–Sale Obligations") were owing to BMDC from MAB and/or HSI, respectively:

| Obligation | Obligor | Outstanding Debt |
|---|---|---|
| $8 Million Obligation | HSI/MAB | $ 9,300,000.00 |
| $2.6 Million of Acquisition Funds | MAB | $ 2,660,000.00 |
| Renovation Loans | MAB | $ 3,121,187.00 |
| Preferred Stock | MAB | $ 1,635,025.00 |
| 16 BMDC Leases | HSI | $ 4,087,653.82 |
| Total | | $20,803,865.82 |

*The Post–Sale Obligations Owing to BMDC*

Pursuant to a Stock Purchase Agreement dated March 1, 1996, between Michael A. Bennett, Allegro, MAB, HSI and BMDC, Allegro purchased all of the stock of MAB for $18,010,000 (the "Sale"), thereby acquiring control of HSI and the Hotel.[6] Allegro paid $1,800,000 in cash directly to BMDC, and $10,000 in cash to Michael Bennett, apparently MAB's sole shareholder. *See Exhibit S to Alas Affidavit.* To finance the balance of the purchase price, Allegro and HSI jointly executed and delivered to BMDC a non-recourse Amended and Restated Promissory Note (the "Amended and Restated Note")[7] in the principal amount of $16,200,000. *See Exhibit I to October 2, 1996 Szlosek Affidavit.* Allegro, HSI and BMDC executed a Consolidation, Modification and Extension Agreement, consolidating mortgages purportedly held by BMDC into a single mortgage on HSI's interest in the Hotel, securing the Amended and Restated

---

4. Although the $8 Million Obligation was owing from HSI under the Plan, it appears that BMDC classified this Obligation on its books as owing from MAB.

5. The other 64 Leases (the "BFG Leases") remain on the books of BFG, and reflect an aggregate balance of $1,577,390.87 owing from HSI, as of February 29, 1996. *See id. at ¶¶ 13 and 18.*

6. The Stock Purchase Agreement is facially between only Michael A. Bennett and Allegro. However, MAB, HSI and BMDC are signatories

to the Stock Purchase Agreement. *See Exhibt I to Affidavit of Paul B. Szlosek, Sworn to October 2, 1996 (the "October 2, 1996 Szlosek Affidavit"), submitted under cover of the Notice of Motion.*

7. The Amended and Restated Note purports to amend and restate the four secured obligations acquired by BMDC in HSI's bankruptcy—the same obligations which this Court ordered be recast and restructured into a single $8,000,000 obligation owing from HSI to BMDC.

Note (the "$16.2 Million Mortgage"). *See id., Exhibit L.*[8]

Additionally, Allegro entered into 1) a lease agreement (the "Lease") with Olympus Property Management Corporation ("Olympus")[9] pursuant to which Olympus agreed to lease the Hotel from Allegro at a monthly rental rate of $270,833.33, *see id., Exhibit M,* and 2) an Assumption Agreement (the "Assumption Agreement") with MAB, HSI and Olympus, pursuant to which Olympus agreed to assume, *inter alia,* most of the Pre–Sale Obligations, as more fully explained below. *See Exhibit A to Declaration of James G. Gamble, filed December 11, 1996.* Allegro also received BMDC's guaranty of Olympus' payments to Allegro under the Lease for a period of three years, in the aggregate amount of $9,700,000 (the "Guaranty").[10] *See id., Exhibit O.*

The Trustee contends that the Sale effectively reduced and/or extinguished various Pre–Sale Obligations for no consideration. To understand the Trustee's argument, it is necessary to examine the interrelationship between the Amended and Restated Note, the Lease, the Guaranty and the Assumption Agreement.

In the Amended and Restated Note and in the Guaranty, it was acknowledged that the sole source of funds with which to keep that Note current would be the Lease proceeds received from Olympus. It was further acknowledged in the Note that Hotel revenues were to be the sole source of funds available to Olympus to make Lease payments. Allegro therefore obtained BMDC's Guaranty of Olympus' payments under the Lease for a three year period, aggregating $9,700,000.

Because it was understood that interest on the Amended and Restated Note (owed to BMDC) was to be paid from Lease proceeds, and because BMDC guaranteed $9,700,000 of Lease proceeds, BMDC had effectively guaranteed a $9,700,000 obligation owed to itself. Further, under the terms of the Amended and Restated Note, BMDC could not declare a default thereunder or foreclose the $16.2 Million Mortgage unless and until Allegro received $9,700,000 under the Lease.

Pursuant to the Assumption Agreement, Olympus agreed to assume all existing obligations with respect to the Hotel except the Amended and Restated Note, the $16.2 Million Mortgage and post-closing income taxes. Thus, Olympus assumed the unsecured $2.6 million loan, the Renovation Loans, the 16 BMDC Leases (collectively, the "Assumed Obligations"), totalling in excess of $9.8 million, and presumably the BFG Leases. Pursuant to the terms of the Assumption Agreement, Olympus agreed to indemnify HSI, MAB and/or Allegro for any payment any of them might make to BMDC on account of the Assumed Obligations. Under the terms of the Amended and Restated Note, if HSI, MAB or Allegro were to pay an Assumed Obligation which Olympus did not reimburse, HSI and Allegro could offset any such payments against amounts due to BMDC under the Amended and Restated Note. As a result, any payment which HSI, MAB and/or Allegro might make on any of the Assumed Obligations would work a dollar for dollar reduction in the amount owed BMDC under the Amended and Restated Note.[11] The Assumption Agreement further provided that any amounts which Olympus failed to pay

---

8. The $16.2 Million Mortgage appears to consolidate various mortgages which BMDC acquired in connection with HSI's bankruptcy, which evidence the same liens which were to be recast and restructured into a single $8 million mortgage lien pursuant to the HSI Plan.

9. Allegro does not dispute the Trustee's contention that Olympus was wholly owned by Michael A. Bennett, and expressly acknowledges that Michael A. Bennett was Chief Executive Officer and President of Olympus. *See Allegro's Memorandum of Law filed October 21, 1996, at p. 11.*

10. Olympus never made one payment under the Lease, and, in fact, at the closing on March 1, 1996, BMDC was called upon to honor the Guar-

anty. Thus, although BMDC received $1.8 million in cash from Allegro, this amount was offset by $541,666.66 which BMDC paid to Allegro pursuant to the Guaranty at closing, representing Lease payments for February and March 1996. *See Exhibt S to Alas Affidavit; Affidavit of Michael French, Sworn to September 26, 1996, submitted under cover of Notice of Motion, at ¶18.*

11. Presumably, any payments made on the BFG Leases resulted in an offset against amounts owed to BMDC under the Amended and Restated Note.

thereunder could be deemed to be additional rent due under the Lease.

The Trustee asserts that the Sale effectively extinguished the Assumed Obligations and left BMDC with 1) $1,500,000 in cash received from Allegro;[12] 2) an obligation to pay $9,700,000[13] to Allegro which, though ostensibly contingent under the Guaranty, was in fact always non-contingent and primary given Olympus' clear inability and/or lack of intention to ever perform under the Lease; and 3) a non-recourse $16,200,000 note secured by a first mortgage lien on the Hotel, neither of which could be enforced until Allegro received $9,700,000 in Lease payments. Thus, the Trustee maintains that the Sale resulted in a net loss to BMDC of $12,800,000 because loan receivables owing to BMDC were reduced from $20,800,000 to $8,000,000,[14] and that BMDC therefore actually received "negative consideration" by virtue of the Sale.

### DISCUSSION

*Standards for Summary Judgment*

Federal Rule of Civil Procedure 56(c), made applicable to this proceeding by Fed. R.Bankr.P. 7056, provides that summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled, as a matter of law, to a judgment in its favor. *See Federal Deposit Ins. Corp. v. Bernstein,* 944 F.2d 101, 106 (2d Cir.1991). While summary judgment is recognized as a useful tool to expeditiously conclude litigation, *see Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980), it is also a drastic procedural weapon which serves to abrogate a party's right to present its case. *See Heyman v. Commerce and Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Therefore, courts should grant summary judgment motions cautiously so that a litigant is not improperly denied a trial on the issues. *See*

*G.W. White & Son v. Tripp (In re Tripp),* 189 B.R. 29, 33–34 (Bankr.N.D.N.Y.1995).

In assessing the record to determine whether genuine issues of material fact are present, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See LaFond v. General Physics Servs. Corp.,* 50 F.3d 165 (2d Cir.1995). When presented with a motion for summary judgment, the trial court's task is limited to carefully "discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue finding; it does not extend to issue resolution." *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). If there is any evidence in the record from any source from which to draw a reasonable inference in favor of the non-moving party, summary judgment is improper. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

For purposes of a summary judgment motion, the initial burden is on the movant to identify relevant portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " which allegedly demonstrate the absence of a genuine issue of material fact. *Smythe v. American Red Cross Blood Services,* 797 F.Supp. 147, 151 (N.D.N.Y. 1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2558, 91 L.Ed.2d 265, 274 (1986)). Once the moving party has met this initial burden, the burden shifts to the non-moving party to demonstrate that there a genuine issue of material fact exists. *See id.* "[T]he non-movant must do more 'than simply show that there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552

---

**12.** This figure appears to represent the Trustee's estimate of the net sum received by BMDC after subtracting the payments made by BMDC to Allegro pursuant to the Guaranty.

**13.** Because the Trustee calculated the cash received by BMDC as net of amounts BMDC paid pursuant to the Guaranty, the balance of the

$9,700,000 obligation under the Guaranty should have been correspondingly reduced.

**14.** This figure is arrived at by adding the difference between $16.2 million and $9.7 million to the $1.5 million in cash estimated to have been received by BMDC.

(1986)). " 'Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor.' " *Id.* (quoting *Greenblatt v. Prescription Plan Servs. Corp.*, 783 F.Supp. 814, 819–20 (S.D.N.Y.1992)).

*Failure to Amend Amended Complaint*

■ Before turning to the substance of the Trustee's Motion, the Court must address two procedural matters raised by Allegro. Allegro opposes the Motion on the ground that it seeks relief based upon facts not pleaded in the Amended Complaint or in the Motion. The Trustee was apparently unaware of HSI's bankruptcy at the time he filed the Motion, as a result of which he pleaded that at least $17,000,000 in secured debt (the aggregate amount owed to secured lenders prior to entry of the HSI Confirmation Order) was owing from HSI at the time of the Sale, and made no mention of any of the Assumed Obligations. When Allegro showed that secured debt owing from HSI had been reduced to a total of $8,000,000 by virtue of the HSI Confirmation Order, the Trustee conceded the issue, but in subsequent memoranda supported by affidavits made the additional argument that the Assumed Obligations had been reduced or extinguished by virtue of the Sale. Allegro argues that the Trustee's failure to amend his Complaint to plead these new facts warrants denial of the Motion.

Federal Rule of Civil Procedure 15(b), as incorporated by Fed.R.Bankr.P. 7015, provides in pertinent part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits . . .

Fed.R.Civ.P. 15(b). Rule 15(b) reflects a liberal policy which favors amendments of pleadings at any time, unless a party would be prejudiced thereby. *See Galindo v. Stoody Co.*, 793 F.2d 1502, 1512–13 (9th Cir. 1986). The general rule as summarized by one court is:

Although no formal amendment [be] made, a district court may amend the pleadings merely by entering findings on the unpleaded issues. "The rule provides that issues actually tried by the consent of the parties are treated in all respects as if they had been raised in the pleadings, even if the parties have failed formally to amend the pleadings. If an amendment should have been made, we will presume that it has been made."

*Id.* at 1513 n. 8 (quoting *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1522 (9th Cir. 1985), other citation omitted). *Compare Securities and Exchange Commission v. Nat'l Student Marketing Corp.*, 73 F.R.D. 444, 447 n. 10 (D.D.C.1977) (allowing amendment where party had formally moved for amendment by way of brief).

■ Rule 15(b) also applies at the summary judgment stage of proceedings. " '[W]hen deciding a motion for summary judgment the court may evaluate not just the issues presently tendered by the pleadings but those which can reasonably be raised in an amended pleading.' " *Moreno v. Schwartz (In re Schwartz)*, 36 B.R. 355, 357 (Bankr.E.D.N.Y.1984) (quoting *National Agr. Chemicals Ass'n v. Rominger*, 500 F.Supp. 465, 473 (E.D.Cal.1980)). Rule 15(b) "contemplates that under normal circumstances the trial court's judgment effectuates the amendment. However, it is now settled that the process of amendment may be *initiated* by presentation of an issue for the first time in a motion for summary judgment."

*In re Zweibon,* 565 F.2d 742, 747 n. 20 (D.C.Cir.1977) (citing *Hayes v. Philadelphia Transportation Co.,* 312 F.2d 522 (3d Cir. 1963); *Seaboard Terminals Corp. v. Standard Oil Co.,* 104 F.2d 659 (2d Cir.1939); and 10 C. Wright & A. Miller, Federal Practice and Procedure § 2722 at 477 n. 22 (1973)). *But see Crawford v. Gould,* 56 F.3d 1162, 1168–69 (9th Cir.1995) (finding that Rule 15 did not apply in summary judgment context because Rule 15 applies only to amendments to conform pleadings to issues actually litigated at trial.).

The rule in the Second Circuit is that amendments to pleadings are to be allowed in the absence of a showing by the non-moving party of prejudice or bad faith. *See Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993). Allegro broadly maintains that the Trustee has proceeded in a procedurally defective manner, but does not assert that it has been prejudiced by the Trustee's failure to amend the Amended Complaint. Allegro simply appears to assert that genuine issues of material fact must be present because the Trustee has presented more than one factual scenario upon which he seeks relief. This is not a basis on which to prohibit amendment of pleadings. Therefore, the Court will deem the Amended Complaint to be amended by the Trustee's Motion and supporting papers. *See Kogan v. Schulte,* 61 F.Supp. 604, 606 (S.D.N.Y.1945) (stating, "the transactions, on which partial summary judgment is sought, are embraced within the broad allegations of the complaint, but if the complaint were not sufficiently broad, it might be deemed amended to include the essential allegations of the affidavits as to these particular transactions.") (citing *Seaboard Terminals Corp. v. Standard Oil Co.,* 104 F.2d at 660).

*Sufficiency of Pleading—Fed.R.Bankr.P. 7009*

■ Allegro also questions, without any supporting argument, "[w]hether the averments as to either Allegro, MAB, and/or HSI, comply with the specificity requirements of Fed.R.Civ.P. 9(b) and Bankruptcy Rule 7009." *See Allegro's Counter–Statement of Material Disputed Facts in Response to Plaintiff's Rule 913.1(i) Statement,*

*filed October 21, 1996, p. 6.* Federal Rule of Civil Procedure 9(b), incorporated herein by Fed.R.Bankr.P. 7009, requires that circumstances surrounding allegations of fraud be pleaded with particularity, but allows intent and knowledge to be averred generally. *See* Fed.R.Civ.P. 9(b); Fed.R.Bankr.P. 7009. "[A]llegations of fraud must be concrete and particularized enough to give notice to the defendants of the conduct complained of, to enable the defendants to prepare a defense." *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 498 (N.D.Ill.1988) (quoting *D & G Enterprises v. Continental Illinois National Bank,* 574 F.Supp. 263, 267 (N.D.Ill.1983)).

■ Here the First Amended Complaint contains 357 paragraphs detailing the massive fraud alleged to have been perpetrated by the Bennett Group. Paragraphs 122–131 describe the Sale of the Hotel as one aspect of the overall fraud. Paragraphs 176–184 involve the theories of relief which are the subject of the instant Motion. As discussed above, the Trustee has effectively amended the Amended Complaint to reference the $8 Million Obligation and the Assumed Obligations. Having reviewed the Trustee's pleadings, as amended, the Court finds that they comply with Fed.R.Civ.P. 9(b), which requires a pleading of 1) specified facts, 2) sources that support the alleged specific facts and 3) a basis from which an inference of fraud may fairly be drawn. *See In re Rave Communications, Inc.,* 138 B.R. 390, 395 (Bankr.S.D.N.Y.1992) (citing *Crystal v. Foy,* 562 F.Supp. 422, 425 (S.D.N.Y.1983) and *Hassett v. Zimmerman (In re O.P.M. Leasing Services, Inc.),* 32 B.R. 199, 203 (Bankr. S.D.N.Y.1983)). In so finding, the Court notes that "[c]ourts generally evaluate averments of fraud in the bankruptcy context more liberally than in other civil actions charging fraud." *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. at 498.

*The Trustee's Causes of Action*

The Trustee is proceeding under Code §§ 548(a)(1) and (a)(2), as well §§ 270–281 of the NYD&CL, as incorporated by Code § 544(b). Code § 548(a)(1) and NYD&CL § 276 each allow for the avoidance of certain transfers of an interest in property of the

debtor made, or obligations incurred, with actual intent to hinder, delay, or defraud creditors. Under Code § 548(a)(2) and NYD & CL § 273, a transfer of an interest in a debtor's property is deemed constructively fraudulent without regard to actual intent if, *inter alia*, the transfer is made at a time the debtor is insolvent and adequate consideration is not received therefor.[15] The NYD&CL parallels Code § 548 and the two statutes have been interpreted similarly by the courts. *See European American Bank v. Sackman Mortgage Corp. (In re Sackman Mortgage Corp.)*, 158 B.R. 926, 938 (Bankr. S.D.N.Y.1993) (noting the similarity between the two statutes); *Scherling v. Pan Trading Corp., S.A. (In re Chadborne Indus., Ltd.)*, 71 B.R. 86, 89 (Bankr.S.D.N.Y.1987) (same); *Pereira v. Checkmate Communications Co., Inc. (In re Checkmate Stereo & Electronics, Ltd.)*, 9 B.R. 585, 591 (Bankr.E.D.N.Y.1981) (same), *aff'd*, 21 B.R. 402 (E.D.N.Y.1982).

*Allegro's Defenses and Counterclaims*

■ Allegro argues that the Trustee's Motion should be denied until Allegro has had an opportunity to litigate the counterclaims which it has asserted in its Answer (the "Answer") to the Amended Complaint. In its Answer, Allegro asserted counterclaims against, *inter alia*, BMDC for breach of the Guaranty and for fraud in the inducement in consummating the Sale and/or executing the documents related thereto. *See Answer of Defendants Allegro Property & Finance, Inc., M.A. Bennett Associates, Ltd., and Hotel Syracuse, Inc. to First Amended Complaint, attached as Exhibit E to Declaration*

*of Schuyler G. Carroll, filed October 21, 1996, at ¶¶ 36–42.* A claim of fraud in the inducement may be a defense to the enforceability of a contract which, if supported by sufficient evidence, will preclude entry of summary judgment in a suit to enforce the contract. *See Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985); *Centronics Financial Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir. 1978); *Hunt v. Bankers Trust Co.*, 689 F.Supp. 666, 673–75 (N.D.Tex.1987); *Frankel v. ICD Holdings S.A.*, 930 F.Supp. 54, 61–65 (S.D.N.Y.1996); *Fortunoff v. Triad Land Assocs.*, 906 F.Supp. 107 (E.D.N.Y.1995). The Trustee's suit is not one to enforce a contract, however. In fact, Allegro does not dispute the validity or enforceability of the Sale or of any of the documents executed in connection therewith. Rather, Allegro seeks money damages on its counterclaims.[16] *See Answer, at p. 12.* It would thus appear to be Allegro's argument that summary judgment should be denied because Allegro may be able to recoup or setoff such damages against any recovery to which the Trustee may be entitled. Regardless of whether recoupment or setoff would be available to Allegro, neither a counterclaim in the nature of recoupment nor a counterclaim in the nature of setoff is sufficient to preclude summary judgment.[17] *See Hunt v. Bankers Trust Co.*, 689 F.Supp. at 672. Therefore, Allegro's counterclaims are legally ineffectual to prevent the Court from granting the Trustee's Motion. *See id.*

---

**15.** Code § 548(a)(2) allows for avoidance of transfers and obligations incurred for which "reasonably equivalent value" is not received by the debtor, while NYD&CL § 273 allows for avoidance of transfers and obligations incurred for which "fair consideration" is not received. The two terms have substantially the same meaning, although the definition of "fair consideration" under the NYD&CL expressly incorporates the concept of good faith in making a transfer, whereas the term "reasonably equivalent value" does not. *See United States v. McCombs*, 30 F.3d 310, 326 n. 1 (2d Cir.1994).

**16.** A party who has been fraudulently induced to enter into a contract may pursue one of three remedies: 1) rescind the contract absolutely, and sue to recover the consideration parted with

upon the fraudulent contract; 2) sue in equity to rescind the contract; or 3) affirm the contract and sue for damages. *See duPont v. Perot*, 59 F.R.D. 404, 410 (S.D.N.Y.1973) (quoting *Goldsmith v. National Container Corp.*, 287 N.Y. 438, 442–43, 40 N.E.2d 242, 244 (1942)).

**17.** The Court notes that Allegro appears to characterize its fraudulent inducement counterclaim as being in the nature of recoupment, insofar as it questions "[w]hether plaintiff's claims ... are barred ... under the doctrine of recoupment, especially since defendants have asserted meritorious defenses and counterclaims for fraudulent inducement and breach of contract." *See Allegro's Counter–Statement of Material Disputed Facts in Response to Plaintiff's Rule 913.1(i) Statement, p. 6.*

Allegro defends against the substance of the Trustee's Motion primarily by reference to Code § 548. Allegro does not dispute that the Sale occurred within one year of the commencement of BMDC's case, nor that BMDC was insolvent as of the date of the Sale. Allegro's position is that summary judgment is inappropriate as a matter of law under Code §§ 548(a)(1) and (2) because there has been no transfer of an interest in BMDC's property. For this reason, Allegro also maintains that the Trustee does not have standing to prosecute a cause of action against Allegro. Alternatively, Allegro argues that, if a transfer of an interest in property of BMDC did occur, the Trustee is not entitled to summary judgment because he has not shown, and cannot show, an actual intent to defraud or that BMDC did not receive reasonably equivalent value/fair consideration for the transfer.

*Transfer of an Interest in Property of the Debtor*

■ Allegro asserts that the Trustee "is really seeking to avoid . . . both (i) Allegro's purchase of MAB's stock from non-debtor Michael Bennett; and (ii) the modification of BMDC's 8 Million Note into the 16.2 Million Note . . . ," and argues that there was no transfer of BMDC's property because BMDC did not own the MAB stock. *See Allegro's Memorandum of Law filed October 21, 1996, at p. 20.* In making this argument, Allegro appears to misapprehend the Trustee's position. The Trustee does not contend that the transfer of MAB stock is itself the allegedly fraudulent transfer now in question. Rather, the Trustee contends that the transfer of MAB stock to Allegro was facilitated through the reduction and/or extinguishment of obligations owing to BMDC, and that such reduction and/or extinguishment constitutes a fraudulent transfer within the meaning of Code § 548 and NYD&CL §§ 270–81.

The term transfer, as used in Code § 548, "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including the retention of title as a security interest and foreclosure of the debtor's equity of redemption." *See* 11 U.S.C. § 101(54). The NYD&CL is New York's version of the Uniform Fraudulent Conveyance Act, and therefore speaks in terms a "conveyance," which is defined to include, *inter alia,* every "transfer." *See* NYD&CL § 270. To the extent that any of the Pre-Sale Obligations were valid and enforceable and subsequently reduced and/or extinguished, a transfer of BMDC's property and/or interest in property clearly occurred for purposes of Code § 548 and NYD&CL §§ 273 and 276, and the Trustee has standing to attempt to avoid any such transfer.

*Allegations of Actual Fraud*

■ Because actual intent is difficult to prove, courts employ presumptions, or "badges of fraud," as circumstantial evidence of actual intent. *See* 5 Collier on Bankruptcy ¶ 548.04[2][b] at 548–24 (L. King 15th ed. rev.1997). Such badges of fraud may include

> concealment of facts and false pretenses by the transferor, reservation by the transferor of rights in the transferred property, his or her absconding with or secreting the proceeds of the transfer immediately after their receipt, a transfer for no consideration when the transferor and the transferee know of the claims of creditors and know the creditors cannot be paid, the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor, the fact that the transfer was made to satisfy or secure a debt long since forgiven, the fact that the transferee was an officer or an agent or creditor of an officer of an insolvent corporate transferor, and the creation by an oppressed debtor of a closely-held corporation to receive the transferred property.

*Id.* at 25–26 (footnotes omitted). The Second Circuit has recognized the following badges of fraud: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset

of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir.1983) (citing *In re May*, 12 B.R. 618, 627 (N.D.Fla. 1980)).

■ "Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' states of mind." *Golden Budha Corp. v. Canadian Land Co. of America*, 931 F.2d 196, 201–02 (2d Cir.1991) (citing *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir.1991)); *see also Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir.1991), *cert. denied sub nom. Rally's, Inc. v. Int'l Shortstop, Inc.*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). In fact, "[s]ummary judgment is exceedingly rare due to the intent element, which, is almost always an issue of fact." *State of New York v. N. Storonske Cooperage Co., Inc.*, 174 B.R. 366, 390 (N.D.N.Y.1994). Yet, as the Trustee asserts, fraudulent intent may in some cases be determined on a motion for summary judgment. The Second Circuit has stated that "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *see also Citizens Bank of Clearwater v. Hunt*, 927 F.2d at 711. The Trustee contends that summary judgment is appropriate here on the question of fraudulent intent because he has adequately established the existence of several of the aforementioned badges of fraud. *See Matter of Russo*, 1 B.R. 369, 382 (Bankr.E.D.N.Y.1979) (presence of several badges of fraud "will always make out a strong case" for fraudulent intent); *see also Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir.1991) (presence of several badges of fraud "can constitute conclusive evidence of actual intent to defraud").

In an effort to establish the requisite evidence of actual fraud, the Trustee asserts that 1) BMDC did not receive any consider-ation in exchange for its notes and mortgages, 2) the Sale of the Hotel "was a deal in which BMDC was on both sides of the transaction, rather than an arms-length transaction, since BMDC ... effectively retained a significant ownership interest in Allegro's parent company, Equivest International," 3) BMDC's financial condition worsened after the Sale, and 4) the Sale was not an isolated transaction, but "part of a series of deals just prior to bankruptcy in which an increasingly desperate Patrick Bennett liquidated assets for far less than their true value in order to prevent the Ponzi scheme from collapsing." *See Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, etc., filed October 2, 1996, p. 19–20.*

The Court will first address the Trustee's contention that, following the Sale, BMDC retained an ownership interest in Allegro's parent company. In support of this argument, the Trustee submitted the Declaration of Jonathan Rosenberg ("Rosenberg"), an associate attorney at Simpson, Thacher & Bartlett ("Simpson Thacher"), counsel to the Trustee. Rosenberg's Declaration includes as an exhibit thereto what is apparently a computer generated printout of a Standard & Poor profile indicating that Allegro is the wholly-owned subsidiary of Allegro Property, Inc., a Canadian corporation which changed its name from Equivest International Financial Corp. ("Equivest") in March 1996. *See Exhibit A to Declaration of Jonathan Rosenberg submitted under cover of Notice of Motion.* According to Rosenberg, BMDC owned 2.1 million of the 7.4 million outstanding shares of Equivest as of October 25, 1995, based upon what appears to be a certified list of Equivest shareholders attached as Exhibit B to the Rosenberg Declaration. *Id. at ¶ 4.* On June 28, 1996, Rosenberg and other lawyers at Simpson Thacher were allegedly informed by Vincent Low, President of Allegro, "that BMDC sold its 2.1 million shares in Equivest ... in January 1996 so that the ... [Sale] would not be a related-party transaction." *Id. at ¶ 5.*

Rosenberg asserts that the sale of the stock was never consummated, but rather placed in escrow pending the satisfaction of certain promissory notes given to BMDC by

the "purchasers." This conclusion is based upon a letter dated May 16, 1996 (the "Letter") received by Simpson Thacher from counsel for Americorp Securities, Inc. ("Americorp"). According to the Letter, Americorp acted as escrow agent for the Equivest stock, pursuant to certain "sale agreements." The Letter provides in pertinent part:

> Pursuant to the terms of the sale agreements, dated January 11, 1996, each of the three purchasers acquired 700,000 shares of Equivest International stock from Bennett for a purchase price of $666,667 (the "Purchase Price"). Per the agreements, the Purchase Price was paid in the form of a promissory note secured by the shares of stock, which continue to be held in escrow by our client. Copies of the agreements, the promissory notes and the share certificates are enclosed.

> As the agreements indicated, if payment on the notes was not made by April 15, 1996, the shares were to be returned to Bennett. Our client has advised that the purchasers determined not to pay the promissory notes on or before April 15, 1996 but instead to return the shares to Bennett.

*Id., Exhibit C.*

The Letter is hearsay to the extent that it is being offered to prove the truth of the matters asserted therein, *see* F.R.E. 801(c); *see also, e.g., Lyle v. Koehler,* 720 F.2d 426, 432–33 (6th Cir.1983); *Brown v. ASD Computing Center,* 519 F.Supp. 1096, 1103 n. 2 (S.D.Ohio 1981). The Letter may arguably be admissible under the business record exception to the hearsay rule, *see F.R.E. 803(6); see also Kehm v. Procter & Gamble Mfg. Co.,* 724 F.2d 613, 626 (8th Cir.1983), but the Court notes that the Trustee has failed to submit the agreements, notes and the share certificates referred to therein, and the weight to which the Letter would be entitled at trial is therefore questionable.

More importantly, however, Allegro has submitted evidence from which a reasonable inference can be drawn that BMDC did not own the Equivest stock at the time of the Sale. First, the Standard & Poor report submitted by the Trustee itself appears to indicate that Central, Inc., Hellwood Trading, Inc. and Montana Holdings, Inc., the three purchasers to whom the Letter refers, were stockholders of record as of January 12, 1996. Additionally, Allegro submitted the affidavit of Stanley Brian Findlay, a director of Allegro Property, Inc., who electronically filed an Insider Report with the British Columbia Securities Commission (the "BCSC"). A copy of this report purporting to evidence BMDC's sale of the Equivest stock is attached to his affidavit. *See Exhibit A to Affidavit of Stanley Brian Findlay, Sworn to October 17, 1996.*

Allegro also submitted the affidavit of Robert G. Smiley, counsel to Allegro Property, Inc. and formerly counsel to Equivest, indicating that he had personally filed with the BCSC on or about December 28, 1995, a "Form 23 of the British Columbia Securities Act" advising BCSC of BMDC's intention to sell its Equivest stock. *See Affidavit of Robert G. Smiley, Sworn to October 17, 1996, at ¶ 2.* A copy of that form is attached as Exhibit A to Smiley's affidavit. *See id., Exhibit A.* Also attached to Smiley's affidavit are copies of Equivest's stock register apparently kept by Montreal Trust Company, as transfer agent, purporting to show shareholders of record as the close of business on May 29, 1996 and July 16, 1996, and December 1, 1996. All three registers appear to indicate that Central, Inc., Hellwood Trading, Inc. and Montana Holdings, Inc. each own 700,000 shares as of the respective record dates, although the May 29, 1996 register does not appear to be certified. *See id., Exhibit B.*

The Court finds that the Findlay and Smiley affidavits, together with the exhibits attached thereto, raise a genuine issue of fact as to whether BMDC owned any stock of Equivest or Allegro Property, Inc. following the Sale. It might be possible to ultimately prove that BMDC effectively retained an ownership interest in that stock following the Sale. However, viewing things most favorably to Allegro, the Court must conclude that Allegro has submitted admissible evidence from which it could be reasonably inferred that BMDC did not in fact retain an ownership interest in Equivest or Allegro Property, Inc. following the Sale. For the reasons

set forth below, however, resolution of this question is, in the present context, immaterial to the ultimate question of actual intent.

 The alleged fact of BMDC's retention of an ownership interest in Allegro's parent implicates only one badge of fraud asserted by the Trustee. While there is little evidence in the record of some of the other badges of fraud asserted by the Trustee, *i.e.*, a worsening of BMDC's financial condition following the Sale and a pattern of the Bennett Group transferring assets for inadequate consideration immediately prior to bankruptcy, actual fraudulent intent may be inferred, apart from traditional badges of fraud, "from circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction." *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir.1995) (citing *United States v. McCombs*, 30 F.3d at 327–28); *see also Elgin Sweeper Co. v. Melson, Inc.*, 884 F.Supp. 641, 649 (N.D.N.Y.1995). Furthermore, actual fraud may be inferred where insufficient consideration is received for a transfer. *See Atlanta Shipping Corp., Inc. v. Chemical Bank*, 631 F.Supp. 335, 347 (S.D.N.Y.1986) (citing *De West Realty Corp. v. Internal Revenue Service*, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976)), *aff'd*, 818 F.2d 240 (2d Cir.1987); *see also United States v. McCombs*, 30 F.3d at 328 (citations omitted). The transfers now in question were part of an unusual transaction in which the Trustee asserts that BMDC sustained a net loss of assets. Thus, Allegro primarily opposes the Trustee's Motion by asserting that several genuine issues of material fact exist regarding the amount of the debt owing to BMDC before the Sale, which ultimately bear on the issue of whether and to what extent consideration was received.

*Whether the $8 Million Obligation Survived Confirmation of the HSI Plan*

First, Allegro contends that a question of fact exists as to whether the $8 Million Obligation was enforceable. Allegro maintains that, prior to the Sale, the $8 Million Obligation was not enforceable against HSI because, contrary to the requirements of the HSI Plan, and as conceded by the Trustee,

there was no restructured note or mortgage to evidence such an obligation. Allegro therefore questions whether "the note and mortgage claims which plaintiff asserts that BMDC had on February 29, 1996" were discharged by the HSI Plan and HSI Confirmation Order. *See Allegro's Counter-Statement of Material Disputed Facts in Response to Plaintiff's Rule 913.1(i) Statement, p. 5.* The Trustee asserts that the $8 Million Obligation was enforceable, and secured by a mortgage lien on the Hotel, because "[t]he effect of this Court's [HSI Confirmation Order] was simply to prevent BMDC from enforcing [the secured claims it had purchased] against HSI for more than $8 million, plus interest accruing at 10 percent per annum." *See Trustee's Reply Memorandum, filed December 11, 1996, at p. 12.*

 By virtue of the HSI Confirmation Order, the HSI Plan became a binding contract between HSI and, *inter alios*, BMDC, and must be interpreted in accordance with general contract law. *See McFarland v. Leyh (Matter of Texas General Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir.1995) (citation omitted); *Salmon v. Laser Plot, Inc.*, 189 B.R. 559, 561 (D.Mass.1995) (citations omitted); *Aino v. Maruko, Inc. (In re Maruko, Inc.)*, 200 B.R. 876, 881 (Bankr. S.D.Cal.1996) (citations omitted); *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362 (E.D.Pa.1996) (citations omitted). "Although a confirmed bankruptcy plan is a judgment rendered by a federal court in a case arising under federal law, because there is little need for a nationally uniform body of law regarding the interpretation of Chapter 11 plans and because state law is regularly incorporated into bankruptcy law, state law constitutes the federal rule of decision … [when interpreting a plan]." *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n.*, 997 F.2d 581, 588 (9th Cir.1993) (citations omitted).

 Under New York law, a written contract must be interpreted so as to give effect to the intent of the parties as expressed in the unambiguous language of the contract. *See Cruden v. Bank of New York*, 957 F.2d 961, 976 (2nd Cir.1992) (citing *Breed v. Insurance Co. of North America*, 46

N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)); *In re UFG Int'l., Inc.*, 207 B.R. 793, 797 (Bankr.S.D.N.Y.1997) (citations omitted); *In re CIS Corp.*, 206 B.R. 680, 686 (Bankr.S.D.N.Y.1997) (citations omitted). The threshold determination of whether a writing is ambiguous is a matter of law for the court to decide. *In re CIS Corp.*, 206 B.R. at 686 (citing *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982); Patterson, *Interpretation and Construction of Contracts*, 674 Colum.L.Rev. 833, 839 (1964); and *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England*, 1996 WL 609441 (S.D.N.Y.)).

The HSI Plan provides in pertinent part:

3.03 The Allowed Secured BMDC Claim (Class 3) is impaired under the Plan. BMDC is an affiliate of M.A. Bennett Associates, Ltd., the current manager of the Hotel and proposed purchaser of the shares of stock in the Debtor pursuant to a Stock Purchase Agreement between M.A. Bennett Associates, Ltd. and Joseph M. Murphy, sole stockholder of the Debtor. Both the Chemical Claim, together with the first mortgage securing the Chemical Claim, and the Apple Claim, together with the second mortgage securing the Apple Claim, shall have been transferred and assigned to BMDC prior to confirmation of this Plan. BMDC shall recast and restructure the $12,500,000 first mortgage and mortgage note and the $5,000,000 second mortgage and mortgage note into a new first mortgage ("BMDC Mortgage") and the mortgage note (the "BMDC Note") in the principal amount of eight million ($8,000,000) dollars. The terms of the BMDC Note and the BMDC Mortgage shall be 20 years, principal of $8,000,000. (sic) with an interest rate of ten (10%) percent. The first five (5) years shall be interest only, payments of $66,666.67 per month. Thereafter, years six (6) through twenty (20) shall be repayment of principal and interest, payments of $85,968.41 per month. The difference between the $17,-500,000 principal debt that was owed to Apple Savings Bank and Chemical Bank and the $8,000,000 principal debt owed to BMDC shall be a $9,500,000 deficiency claim, part of the Allowed Deficiency Claim, which shall be treated as a Class 6 Claim.

\* \* \* \* \* \*

6.01 Except as otherwise specifically provided in this Plan, all claims, liens, [and] encumbrances ... against the Debtor and/or against any property or assets of the Debtor are deemed, as of the Effective Date, to be extinguished, released, compromised, settled and discharged, and paid in full, shall not be at any time after such Effective Date be asserted or pursued in any manner against the Debtor or its estate, and shall be payable solely under the Plan, and, on the Effective Date, all creditors shall be enjoined from commencement of any suits, claims, or action against the Debtor or its assets relating to any of the foregoing paid and discharged obligations.

*See Exhibit A to Declaration of Schuyler G. Carrol, filed October 21, 1996.*

A contract term is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of an entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *In re CIS Corp.*, 206 B.R. at 686 (citing *Tucker Leasing Capital Corp. v. Marin Medical Management, Inc.*, 833 F.Supp. 948, 955 (E.D.N.Y. 1993)). Conversely, "contract language is unambiguous when it has a definite and precise meaning, unattended by a danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (citing *Dawson Home Fashions, Inc. v. SRCO Inc.*, 1995 WL 679253 (S.D.N.Y.) and *Keene Corporation v. Bogan*, 1990 WL 1864, *2 (S.D.N.Y.)). A court should "not give undue force to certain words or phrases that would distort or confuse the primary and dominant purpose of the contract." *In re Envirodyne Industries, Inc.*, 161 B.R. 440, 445 (Bankr.N.D.Ill.1993) (construing a contract under New York law, and citing *Empire Properties Corp. v. Manufacturers*

*Trust Co.*, 288 N.Y. 242, 248, 43 N.E.2d 25, 28 (1942)), *aff'd sub nom. Unofficial Committee of 13.5% Noteholders of Envirodyne Industries v. Envirodyne Industries, Inc.*, 1993 WL 763587 (N.D.Ill.1993), *aff'd*, 29 F.3d 301 (7th Cir.1994). Further, "courts should construe an indenture as a whole to carry out the plain purpose and object of the indenture and not limit itself to literal interpretations." *Id.* at 445–46 (citing *Empire Properties Corp.*, 288 N.Y. at 248–49, 43 N.E.2d at 28).

■ With these considerations in mind, the Court concludes that the foregoing HSI Plan language is not ambiguous. The HSI Plan speaks in terms of "the 8,000,000 principal debt owed to BMDC," and reading to the HSI Plan as whole, it is clear that the parties intended an $8,000,000 principal obligation to survive, secured by a lien on the Hotel. Nothing in the HSI Plan indicates that the enforceability of that obligation or the creation of that lien were to be dependent upon the execution of subsequent restructuring documentation. It has long been recognized that the failure to enter into a formal contract contemplated by an informal contract does not affect the obligations already fixed. As one early case states,

> [w]hen the parties intend that a mere verbal agreement shall be finally reduced to writing, as the evidence of the terms of the contract, it may be true that nothing is binding upon either party until the writing is executed. But here the contract was already in writing, and it was none the less obligatory upon both parties because they intended that it should be put into another form ... 'A contract to make and execute a certain written agreement, the terms of which are mutually understood and agreed upon, is, in all respects, as valid and obligatory, where no statutory objection interposes, as the written contract itself would be, if executed. It, therefore, it would should (sic) appear that the minds of the parties had met; that a proposition for a contract had been made by one party, and accepted by the other, that the terms of this contract were in all respects definitely understood and agreed upon, and that a part of the mutual understanding was that a written contract embodying these terms

should be drawn and executed by the respective parties,—this is an obligatory contract, which neither party is at liberty to refuse to perform.'

*Sanders v. Pottlitzer Bros. Fruit Co.*, 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431, 43 Am.St.Rep. 757 (1894) (quoting *Pratt v. Railroad Co.*, 21 N.Y. 308) (other citations omitted); *see also Hasenfratz v. Berger Apartments, Inc.*, 61 N.Y.S.2d 12 (1946). The HSI Plan constitutes a binding contract for the creation and payment of the $8 Million Obligation. All essential contract terms are specified in the HSI Plan. BMDC agreed to compromise its secured claims totalling $17,500,000 in exchange for payment of the $8 Million Obligation, on the terms specified in the HSI Plan, and secured by a lien on the Hotel. An agreement to create a mortgage on specific property is sufficient to create an equitable lien on real property. *See Savings and Loan Ass'n of Kingston v. Berberich*, 24 A.D.2d 187, 264 N.Y.S.2d 989 (3d Dep't 1965) (citations omitted); *see also Datlof v. Turetsky*, 111 A.D.2d 364, 365, 489 N.Y.S.2d 353, 354–55 (2d Dep't 1985) (citations omitted) (stating that "[t]he existence of an equitable lien requires an express or implied contract concerning specific property wherein there is a clear intent between the parties that such property be held, given or transferred as security for an obligation"). For these reasons the $8 Million Obligation remained enforceable and secured by a lien on the Hotel, notwithstanding the failure to execute the restructuring documentation contemplated by the HSI Plan.

■ To the extent that the HSI Plan language at issue can be characterized as ambiguous in preserving any obligations owing to BMDC, the intent of the parties in preserving the $8 Million Obligation is evident in their subsequent conduct. While Allegro contends that no obligations survived confirmation of the HSI Plan, it nevertheless asserts (and the Trustee concedes) that BMDC "received approximately $899,000 in interest ... from the time of the HSI Confirmation Order to March 1, 1996." *See Allegro's Memorandum of Law filed October 21, 1996, at p. 10.* " 'Unquestionably, the practical construction or uniform conduct or prac-

tice of the parties under a contract is a consideration of much importance in ascertaining its meaning and that consideration is entitled to great, if not controlling, influence in ascertaining the parties' understanding of the contract terms and language.'" *Clay v. Perry (Matter of Perry, Adams and Lewis Securities, Inc.)*, 30 B.R. 845, 850–51 n. 15 (Bankr.W.D.Mo.1983) (quoting 17 Am.Jur.2d *Contracts* § 274, pp. 683–684 (1964)). The fact that BMDC received at least $899,000 in interest post-confirmation belies and renders disingenuous any contention that the $8 Million Obligation did not survive confirmation of the HSI Plan.

*The Assignment to David Slyman*

■ Allegro alternatively asserts that the $8 Million Obligation was unsecured, and therefore of little value, because BMDC's pre-Sale lien on the Hotel, if it existed, was assigned to David Slyman ("Slyman") on August 17, 1995, pursuant to an Assignment of Supplemental Mortgage and Consolidation Agreement (the "Assignment") attached as Exhibit B to the Affidavit of Vincent Eng–Chye Low, sworn to February 24, 1997. The Assignment purports to be an absolute assignment of BMDC's right, title and interest in and to a "Supplemental Mortgage and Consolidation Agreement which face amount is equal to $12,500,000.00, dated the 22nd day of September, 1982, made by the City of Syracuse Industrial Development Agency, Ho–Syr Properties and Hotel Syracuse, Inc., collectively as Mortgagor, which was assigned to Bennett Management & Development Corporation as Mortgagee by an assignment recorded on the 28th day of September, 1993 in Book 7228 of Mortgages, page 158 in the office of the Clerk of the County of Onondaga which Supplemental Mortgage and Consolidation Agreement has not been further assigned of record." *See Exhibit B to Affidavit of Vincent Eng–Chye Low, sworn to February 24, 1997.*

It would appear that the mortgage which is the subject of the Assignment is the $12,500,000 mortgage which BMDC acquired from Chemical Bank in HSI's bankruptcy, as that is the only $12,500,000 mortgage established by this record. If so, this is the same mortgage which Allegro contends was discharged under the HSI Plan. Although Allegro is not estopped from making inconsistent or alternative pleadings, *see* Fed. R.Civ.P. 8(e)(2); *see also Mohamed v. Marriott Int'l, Inc.*, 944 F.Supp. 277, 280–81 (S.D.N.Y.1996), for purposes of this Motion it must produce some evidence to establish a nexus between the mortgage referred to in the Assignment and the $8 Million Obligation.

Allegro has not produced any such evidence, only the Assignment itself, which, standing alone, cannot support a reasonable inference that the mortgage referred to therein secured the $8 Million Obligation. Moreover, even if Allegro could demonstrate such a connection, it appears that whatever was assigned was assigned merely as collateral to which BMDC retained title.

It was left to the Trustee to shed light on the circumstances surrounding execution of the Assignment and the consideration therefor, through the affidavit of Stewart L. Weisman ("Weisman"), BFG's former in-house counsel who prepared the Assignment. According to Weisman, in December 1994, BFG agreed to sell Slyman 1) 2,250,000 shares of stock and stock warrants in a company known as Creative Learning Products, Inc. ("CLPI") for $5,500,000, and 2) an option to purchase a boat known as the Speculator, which was then under construction in Florida, for $3,000,000. *See Affidavit of Stewart L. Weisman, Sworn to February 26, 1997.* In late June and early July 1995, Slyman made two transfers aggregating $8,500,000 to BFG. At that time, however, BFG was not prepared to deliver either the CLPI stock or the Speculator, and instead assigned to Slyman certificates of deposits totaling $9,000,000 as collateral for performance of BFG's obligations to transfer the CLPI stock and complete construction of the Speculator to allow for the exercise of the purchase option. The Assignment, and pledges of other hotel properties, were later substituted for the certificates of deposit as collateral for BFG's obligations.

According to Weisman, during the fall and early part of 1996, BFG worked to effectuate

the transfer of the CLPI stock to Slyman. Ultimately, satisfactory authorization was given to the stock transfer agent, and the CLPI stock was officially transferred to Slyman on or about March 22, 1996. *See id.* The Trustee argues that transfer of the CLPI stock had been substantially completed as of the date of the Sale because only the ministerial acts of having the transfer agent record the transfer on its books and issue new shares in Slyman's name remained, and that such acts occurred on March 22, 1996. The Trustee also asserts, based upon Weisman's testimony, that, as of the date of the Sale, construction of the Speculator was 90% complete, and has since been entirely completed. Allegro has not disputed any of Weisman's testimony, or the Trustee's position that the Assignment was a pledge of collateral securing obligations which had been substantially performed as of the date of the Sale.

▮▮▮▮ Under New York law, an assignment of a mortgage as collateral security results in a pledge, rather than a sale, of the mortgage. *See Desser v. Schatz,* 182 A.D.2d 478, 480, 581 N.Y.S.2d 796 (1st Dep't 1992). Even where a transfer is fashioned as an absolute assignment, extrinsic evidence may be used to demonstrate that the transaction was intended for security. Cases have long recognized that

> "[g]enerally the fact that a mortgage is assigned as collateral security does not appear on the face of the assignment. If the assignment be absolute in form, the fact that it was made as collateral security may be shown by parol evidence, just as an absolute conveyance of real property may by such evidence be shown to be a mortgage; or as an absolute bill of sale may be shown to be a mortgage or pledge of personal property."

*Frensdorf v. Stumpf,* 30 N.Y.S.2d 211, 218 (quoting *Barber v. Hathaway,* 47 A.D. 165, 62 N.Y.S. 329 (3d Dep't 1900), *aff'd,* 169 N.Y.

575, 61 N.E. 1127 (1901)). A collateral assignment of a mortgage transfers defeasible title to the mortgage, subject to extinguishment upon satisfaction of the obligation for which the mortgage was assigned. *See Desser v. Schatz,* 182 A.D.2d at 480, 581 N.Y.S.2d 796. Therefore, even if Allegro had provided sufficient evidence to show that BMDC assigned its lien securing the $8 Million Obligation to Slyman, it appears that, as of the date of the Sale, Slyman would have only held the lien subject to a substantial equity interest held by BMDC.

### The Alleged $3.9 Million Payment

▮▮▮▮ Allegro contends that the Trustee has overstated the Pre–Sale Obligations by failing to account for $3,900,000 which MAB paid to BMDC in August 1995 (the "$3.9 Million Payment"), allegedly on account of the $8 Million Obligation. The $3.9 Million Payment is evidenced by written instructions dated August 3, 1995 and August 4, 1995 to wire $3,500,000 and $400,000, respectively, from MAB to BMDC. *See Exhibit A to Affidavit of Vincent Eng–Chye Low, Sworn to October 20, 1996,* ¶ 17. Although the wire transfer instructions do not indicate the consideration for the transfers, Allegro contends that the transfers were made in reduction of the $8 Million Obligation and are not reflected in the Trustee's calculations. Allegro therefore argues that a genuine issue of material fact exists as to 1) the amount of the Pre–Sale Obligations, and 2) whether the $8 Million Obligation was in default prior to the Sale.

The Trustee, in reliance on the Alas Affidavit, acknowledges that the $3.9 Million Payment was initially accounted for on BMDC's books as a reduction in the loan receivable account from MAB, but was subsequently reclassified as a redemption of preferred stock in MAB held by BMDC. *See Alas Affidavit, at* ¶¶ *23–24.*[18] Alas' conclu-

---

18. Allegro appears to argue that the Alas Affidavit is inadmissible because it is not based upon Mr. Alas' personal knowledge, as is required by Fed.R.Civ.P. 56(e). *See Allegro's Memorandum of Law, filed February 25, 1997, at p. 12 n.4, and p. 25–26.* Mr. Alas is a partner in Coopers & Lybrand L.L.P. ("Coopers"), the accounting firm

retained by the Trustee in these cases. *See Alas Affidavit, at* ¶ *1.* In his affidavit, he states: "[s]ince approximately April 1996, I have been working on this matter, along with several other professionals from Coopers. For the last eight months, Coopers has analyzed and reconstructed the books and records of BFG and BMDC, as

sion is supported by copies of journal entries by which the $3.9 Million Payment was initially recorded on BMDC's books and then reclassified as a redemption of preferred stock. *See id., Exhibit R.*

Against the evidence which the Trustee has submitted in the form of the Alas Affidavit and the supporting journal entries of BMDC, is the affidavit of Richard Terris, an accountant retained by Allegro. Terris attacks the Trustee's position regarding the $3.9 Million Payment by stating that "[t]here is no explanation why such payment[ ][was] 'reclassed' or why such payment[ ], made at a time when loans were allegedly outstanding, would be used as redemption of stock and not payment[ ] to reduce the loan." *See Affidavit of Richard Terris, Sworn to February 24, 1997, at ¶ 14.* This affidavit is evidence of nothing, but exposes a weakness in the Trustee's evidence.

The Trustee has not offered any explanation as to why the $3.9 Million Payment was reclassified as a preferred stock redemption and, ideally, should do so given his allegation that hundreds of false entries were made in BMDC's books in 1995 and 1996, including "journal entries reclassing balances, such as from one type of expense to another ..." *See Amended Complaint, at ¶¶ 149–150.* Nevertheless, in the absence of any evidence submitted by Allegro, it can reasonably be inferred from the circumstances surrounding the Sale that the $3.9 Million Payment was intended as a preferred stock redemption. The journal entries relied upon by Alas, dated August 3, 1995 and August 4, 1995, respectively, indicate that the $3.9 Million Payment reduced the value of BMDC's holdings of MAB preferred stock from $5,565,789.04 to $1,665,-789.04. *See id., Exhibit R.* A subsequent journal entry dated March 1, 1996 indicates that the remaining $1,665,789.04 preferred stock interest was removed from BMDC's books upon the recording of the $16.2 Million Mortgage in connection with the Sale. *See id., Exhibit S.* Empirically speaking, it is questionable whether the Sale could have proceeded with BMDC retaining a preferred stock interest in MAB. Although the Stock Purchase Agreement purports to evidence a sale only of MAB common stock, and does not mention the existence of any preferred stock, the Guaranty indicates that the parties are to close a transaction wherein ... Allegro shall purchase all of the issued and outstanding shares of ... MAB from the current owner. *See Exhibit O to Affidavit of Paul B. Szlosek, Sworn to October 2, 1996 and submitted under cover of Notice of Motion.* According to Mr. Low, "Allegro purchased from Michael A. Bennett all of the outstanding shares of stock of M.A. Bennett Associates, Ltd." *See Affidavit of Vincent Eng–Chye Low, Sworn to October 20, 1996,*

well as other Bennett-related companies, and conducted numerous interviews of current and former BFG and BMDC employees. As a result, I have become familiar with the business and operations of BFG and BMDC, and with its books and records. This affidavit is based upon Coopers' review of files and information maintained in our Firm's possession and interviews with certain debtor employees." *See id. at ¶¶ 2 and 3.*

In the absence of an affiant's express statement that he has personal knowledge of the information contained therein, the personal knowledge required by Rule 56(e) may be inferred from the affidavit itself. *See Barthelemy v. Air Lines Pilots Ass'n,* 897 F.2d 999, 1018 (9th Cir.1990) (citing *Lockwood v. Wolf Corp.,* 629 F.2d 603, 611 (9th Cir.1980)); *Hochberg v. Howlett,* 1992 WL 373631 *4 (S.D.N.Y.1992); *cf. Kamen v. AT & T Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (affidavit stricken because information contained in affidavit failed to indicate that it was based upon personal knowledge). *Compare Catawba Indian Tribe v. State of South Carolina,* 978 F.2d 1334, 1342 (4th Cir.1992) (stating that "ordinarily, officers would have personal knowledge of the acts of their corporations", and finding that affidavit of corporate officer satisfied Rule 56(e) because opposition failed to show that officers did not have personal knowledge). The Alas Affidavit essentially sets forth facts gleaned from BMDC's books and records, excerpts of which are attached as exhibits thereto. The Alas Affidavit clearly indicates that Mr. Alas has become familiar with BMDC's books and records over an eight month period, and the Court therefore concludes that Mr. Alas has sufficient personal knowledge of the matters which are the subject of his Affidavit. In any event, the Alas affidavit is sufficient to authenticate and introduce into evidence the exhibits attached thereto, *see Owens–Corning Fiberglas Corp. v. U.S. Air,* 853 F.Supp. 656, 663 (E.D.N.Y.1994), especially in view of the fact that Allegro does not object to the authenticity of any of the exhibits. *See Bieda v. JC Penney Communications, Inc.,* 1995 WL 437689, *9 n. 2 (S.D.N.Y.1995).

¶ 2. Placed in the foregoing context, the journal entries relied upon by Alas are sufficiently probative to require Allegro to do more than simply question why the $3.9 Million Payment was reclassified. Indeed, Allegro's position is undermined by its failure to produce MAB's books, which would presumably reflect the fact that the $3.9 Million Payment was made on account of outstanding loan indebtedness and/or that BMDC still held the preferred stock interest in question.[19] *See Babitt v. Schwartz (In re Lollipop, Inc.)*, 205 B.R. 682, 687 (Bankr. E.D.N.Y.1997) (stating that movant may sustain burden of proof in summary judgment motion by showing that little or no evidence supports non-movant's position, and, thus, finding no triable issue of material fact on issue of consideration where defendant failed to provide any evidence of consideration in the face of sworn affidavit to the contrary).

*The Assumed Obligations*

Allegro generally contends that the Trustee has failed to meet his burden of establishing the validity and/or amount of the Assumed Obligations because the books and records relied upon by the Trustee are inherently unreliable given the Trustee's own assertion that they were doctored and fabricated in furtherance of one of the largest Ponzi schemes in the history of the United States. Allegro therefore infers that it is impossible for the Trustee's accountants to reconstruct the transactions in question with any degree of accuracy, and that the Trustee cannot meet his burden of proof by relying on those books and records.

BMDC's books and records, standing alone, would indeed be highly suspect and entitled to little weight given the Trustee's allegations of false accounting by the Bennett Group. However, as the discussion below indicates, in reconstructing the transactions in question, the Trustee has neither analyzed, reconstructed nor submitted the books and records of BMDC in a vacuum. In the vast majority of instances, he has supported his analyses and conclusions with, not only books and records, but also, *inter alia*, canceled checks, wire instructions, invoices, receipts, bank statements and other documentation to trace the flow of funds to and from various parties. This documentation is augmented by affidavits from the Trustee's accountants, as well as a former attorney and a former accountant for the Bennett Group companies. The Trustee's accountants have indicated that information contained in the books and records of BFG and BMDC, respectively, has been excluded from their analyses in cases where supporting documentation is insufficient or not capable of being independently corroborated. In the absence of specific evidence from which to draw an inference to the contrary, the Court cannot blanketly conclude that the books and records relied upon by the Trustee are unreliable in their entirety. *Cf. Pereira v. Private Brands, Inc. (In re Harvard Knitwear, Inc.)*, 193 B.R. 389, 397 (Bankr.E.D.N.Y.1996) (recognizing the "unique difficulties with which a bankruptcy trustee is often faced in efforts to vindicate fraudulent conveyance statutes" because a debtor's books and records "are often in tatters or non-existent and its principals unhelpful.").

*The Alleged $3.6 Million Payment*

In addition to the $3.9 Million Payment discussed above, Allegro argues that the Trustee has failed to account for $3,648,-274.19 allegedly paid by HSI to BMDC. This argument is based upon Allegro's discovery of a three page document that appears to be a computer printout of part of the cash receipts register of Aloha Leasing, attached as Exhibit C to the Declaration of Schuyler G. Carroll, filed February 25, 1997. The cash receipts register appears to show that on October 11, 1994, HSI made 16 payments aggregating approximately $3.6 million in payments to Aloha Leasing. The top of the first page contains the words "BANK ACCT# : BMDC." On the third page there is a handwritten notation: "Pat, could you

---

**19.** It is worth noting that, if the $3.9 Million Payment were properly classifiable against outstanding loan indebtedness, then either 1) the Sale extinguished $3.9 Million of BMDC's preferred equity in MAB, which should be added to the amount of BMDC assets claimed to have been lost in connection with the Sale, or 2) BMDC continues to hold a $3.9 Million preferred equity position in MAB, which, among other things, might support the Trustee's argument, discussed above, that BMDC retained an interest in MAB and/or HSI following the Sale.

apply through 'BMDC[,]' Shaun." This, Allegro argues, raises genuine issues as to whether it was BMDC, as opposed to Aloha Leasing, that received the $3.6 million, and if so, whether the Trustee has accounted for such payment.

Allegro's argument regarding the significance of the cash receipts register is plagued by a lack of evidence. First, while "Shaun" apparently requested that "Pat" apply payments "through BMDC," there is no evidence as to what was meant by that request, and more importantly, no evidence of compliance with that request. Furthermore, the evidence submitted by the Trustee indicates that this portion of Aloha Leasing's cash receipts register does not reflect the actual exchange of cash, but is rather part of a series of accounting entries by which the 16 BMDC Leases were transferred from BFG to BMDC in October 1994.

According to Alas, no cash was actually exchanged in this process. Rather, BFG increased its intercompany note receivable due from BMDC by $4,087,653.82 and decreased its accounts receivable by the same amount. BMDC accounted for the transaction through an adjusting journal entry, made in September 1995, which increased its intercompany note payable to BFG by $4,087,653.82 and increased its account receivable from HSI by the same amount. Attached as Exhibit K to the Alas affidavit are copies of a Period Summary of Postings, a G/L Daily Summary of Postings and a Cash Receipts register for Aloha Leasing for October 1994 supporting this explanation. *See Alas Affidavit, Exhibit K.*

Paul Szlosek, former controller and accounting supervisor at BFG, further explained:

> Since BFG uses a "cash receipts" computer accounting system, BFG's accounting system will automatically update the financial statement accounts if a cash receipts entry is made. Thus, the accounting de-partment employee who made this entry transferred the leases off of the BFG books by making a fictitious cash entry in the cash receipts computer system in the full amount outstanding at the time of the transfer. This would cause the leases to be removed from the asset side of BFG's balance sheet. This practice was not limited to this one occurrence. The accounting department periodically used this technique in lieu of making journal entries. Entering fictitious cash receipts was simply one way to accomplish necessary adjustments to the financial statement accounts. The final balance of the accounts is correct; it is only the methodology used to get there that results in the creation of fictitious cash entries.

\* \* \* \* \* \*

> The "Cash Receipts Update" is accounted for not as cash, but as a "Note Receivable–Benne Cash Receipts Update." This means that the $3,648,274.19 "Cash Receipts Update" was entered into the asset side of the BFG balance sheet *NOT* as cash, but as a note receivable. This means that BFG did not receive any cash. Rather, BFG simply increased a Note Receivable (i.e., loan account).

\* \* \* \* \* \*

> BMDC made an entry to its accounting books to reflect a Note Payable to BFG in the amount of $4,087,053.82, which includes the $3,648,274.19 amount described above, which was the principal amount due under the leases that BFG transferred to BMDC in October 1994. The remaining amount represents past due payments and interest on those payments under the transferred leases. I personally made the adjusting entry in September 1995.

*See Affidavit of Paul B. Szlosek, Sworn to February 26, 1997, at ¶¶ 5, 6 & 8.*[20]

---

**20.** Szlosek was BFG's controller from January 1996 until the Trustee requested the resignation of all of BFG's officers. From July 1994 through December 1995, he was controller of two other Bennett entities, and from July 1992 through July 1994, he was accounting supervisor at BFG. Since the Petition Date, he has been in charge of the "maintenance" of BFG's books and records and "overseeing the receipt and payment of funds." Since the Petition Date, he has also undertaken an "in-depth investigation" of BMDC's books and records. *See Affidavit of Paul B. Szlosek, Sworn to February 26, 1997, ¶ 1.*

As the Trustee points out, if Allegro believes that HSI paid $3.6 million to Aloha Leasing or to BMDC, then presumably it could have submitted canceled checks or other evidence of payment. Allegro has not done so, and its contention that BMDC received $3.6 million is at best speculation in the face of detailed evidence to the contrary presented by the Trustee. *See In re Lollipop, Inc.*, 205 B.R. at 687. As a result, this contention fails to raise a genuine issue of material fact.

*Debt vs. Equity*

 Allegro alternatively contends that any monies advanced by BMDC on MAB's behalf were not loans but equity contributions, notwithstanding the accounting treatment given to such advances by BMDC. This argument fails for at least two reasons. First, as discussed above, it is undisputed that BMDC was paid at least $899,000 in interest on account of the $8 Million Obligation, thus indicating the existence of a loan. Secondly, this contention is primarily based upon a one page document attached as Exhibit D to the Declaration of Schuyler G. Carroll ("Carroll"), filed February 25, 1997. This document appears to have been printed from a word processing computer program. It is captioned simply "Hotel Syracuse" and appears to be a tabulation of lease payments made from July 1993 to January 1995. The document contains two columns, respectively captioned "Monthly Equity Used" and "Cumulative Equity Used," under which approximately $3.4 million of lease payments appear to be classed. Allegro maintains that this supports its argument that monies advanced on MAB's behalf were equity contributions.

The document attached as Exhibit D to Carroll's Declaration simply purports to be a tabulation and classification of lease payments. No specific leases are identified. Nor is there any indication of who prepared the document. According to Carroll's Declaration, the document was apparently produced by the Trustee in response to a document request served by Allegro. While the fact that a document was produced in response to a discovery request can in some situations be probative of its authenticity, *see, e.g., Air Land Forwarders, Inc. v. United States*, 38 Fed.Cl. 547, 554–55 (1997), a document is not self-authenticating where it is facially unclear what that document purports to be. Carroll, in his Declaration at paragraph 6, asserts that the document makes it apparent that "[f]rom July 1993 through at least January, 1995 ... monies allegedly advanced by BMDC were made as capital contributions." However, the document does not mention BMDC, MAB or any Bennett-related company. Moreover, Carroll has not shown that he has personal knowledge sufficient to authenticate the document. As a result, the Court finds that the document is inadmissible as submitted, and that it therefore does not raise an genuine issue of material fact.

In further support of its general argument that the advances in question cannot be treated as loans to MAB, Allegro has presented documentation which allegedly shows that, in the face of documentation virtually identical to that now submitted by the Trustee, the New York State Department of Taxation and Finance (the "Department of Taxation and Finance") previously refused to recognize the Acquisition Funds and certain capital expenditures for tax purposes. Assuming that this Court would be bound by such a determination, Allegro has not submitted any evidence that the determination of the Department of Taxation was based upon any of the documentation now proffered by the Trustee. The only evidence submitted by Allegro in this regard is a one page exhibit entitled "Hotel Syracuse Purchase Price Detail" which appears to have been attached as an exhibit to the Real Property Transfer Gains Tax Questionnaire which Michael A. Bennett submitted to the Department of Taxation and Finance in connection with the Sale. *See Exhibit B to Declaration of Schuyler G. Carroll, filed February 25, 1997.* There is no evidence that the Department of Taxation and Finance considered any of the voluminous accounting records, canceled checks and the like which have been submitted by the Trustee in support of the instant Motion.

Moreover, what evidence there is indicates that little in the way of documentation was provided to the Department of Taxation and

Finance. Allegro has submitted a document captioned "Tentative Assessment and Return, As Completed by the State Department of Taxation and Finance," dated May 20, 1996, as well as what appear to be two letters from the Department of Taxation and Finance, dated April 9, 1996 and April 22, 1996, respectively. *See id.* The April 9, 1996 letter indicates without detail that, as of that date, insufficient documentation had been provided to allow for a tentative assessment. The April 22, 1996 letter provides in pertinent part:

> Prior to reviewing any costs associated with the capital improvements, certain open issues surrounding the acquisition price must be resolved.
>
> An acquisition price of $16,879,890 has been reported. This amount, according to available records, is based on the assumption of debt. The schedule provided with the pre-transfer filing (copy enclosed) indicates that the assumed debt was $10,189,-890. However, the schedule also leads us to believe that the amounts were estimates and likely to have changed by the time the transfer took place. In order to verify the acquisition price, we request that documents substantiating the loan balances at the time of closing be forwarded to this office.

*See id.*

With respect to disallowance, the Tentative Assessment and Return simply states that "[t]he 1993 acquisition price is unsubstantiated and has been disallowed as such," and that "[a] 25% adjustment has been made for those amounts which may pertain to personal property and have not been confirmed as actual capital improvements made to the real property." Michael A. Bennett's submissions, the two letters and the Tentative Assessment and Return constitute the sum of Allegro's evidence on this issue, which cannot reasonably support an inference that the determination of the Department of Taxation

and Finance was based upon the same evidence now before the Court.

*Money Lent by BMDC*

 Allegro argues that even if the advances in question are considered to be loans, a genuine issue of material fact exists as to whether such loans were made by BMDC "as opposed to other entities (including The Bennett Processing Company, and Aloha Leasing), since defendants are unable to find one check issued by BMDC." This argument has a certain degree of appeal, because almost all of the checks submitted by the Trustee as evidence of the loans in question were issued either by "The Bennett Processing Company, Inc." or by "Aloha Leasing."

The majority of the canceled checks submitted by the Trustee appear to have been issued by "The Bennett Processing Company, Inc." [21] There is no evidence in the record concerning The Bennett Processing Company, Inc. At oral argument, counsel for the Trustee asserted that Allegro's argument about these checks failed to raise a triable issue of fact because, based upon prior proceedings in these cases, it was clear that "The Bennett Processing Center" wrote checks for all the Bennett companies and that this was accounted for on the books of the respective Bennett companies. Effectively, counsel for the Trustee requested that the Court take judicial notice of this.

It should initially be noted that judicial notice of matters involving "The Bennett Processing Center" is of little, if any, probative value in analyzing the affairs of "The Bennett Processing Company, Inc." [22] Moreover, the Court cannot take judicial notice that The Bennett Processing Center wrote checks for all of the Bennett companies based upon the record of these cases. The only facts properly susceptible to judicial notice are those "(1) generally known within the territorial jurisdiction of the trial

---

21. The Court notes, however, that at least one such check submitted by the Trustee was submitted with documentation appearing to show that the check had been issued after having been approved by BMDC. *See generally Exhibit B to Alas Affidavit.*

22. The Court cannot consider the Trustee's reference to "The Bennett Processing Center" to have been an inadvertent mis-statement. A Bennett Group company known as The Processing Center, Inc. is presently a chapter 11 debtor in this court in a case which has been substantively consolidated with the above-captioned cases.

court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." F.R.E. 201(b) *see also In re Nail,* 195 B.R. 922, 924 n. 3 (Bankr.N.D.Ala.1996) (*collecting cases* ). "A court may properly take judicial notice of the existence of each document in a court file, but may only take judicial notice of the truth of facts asserted in documents such as (1) orders, (2) judgments, and (3) findings of fact and conclusions of law because they state the law of the case under the principles of collateral estoppel and res judicata." *Russell, Bankruptcy Evidence Manual,* 1997 Ed., § 201.7. The principles of collateral estoppel and res judicata are not implicated absent an identity of parties from one proceeding to the next. *See Alpert's Newspaper Delivery Incorporated v. The New York Times Co.,* 876 F.2d 266 (2d Cir. 1989). Because Allegro was not a party to any determination which this Court may have previously made concerning the Bennett Processing Center and how the Bennett companies issued checks, judicial notice of any such determination cannot be taken for purposes shaping the instant record.

That the Court cannot take the judicial notice requested by the Trustee does not mean that a genuine issue of material fact exists as to whether the obligations in question were properly owed to BMDC, as opposed to the Bennett Processing Company, Inc. and Aloha Leasing. As discussed above, both parties agree that, following the Sale, BMDC was paid at least $899,000 on account of the $8 Million Obligation. This indicates that, regardless of which Bennett entity issued the checks to acquire this Obligation, it was understood by the parties involved that the Obligation was owed to BMDC. Further, the amounts and dates of two of the checks evidencing the Renovation Loans (one of which was submitted together with documentation expressly indicating that it was issued upon the approval of BMDC), though issued by the Bennett Processing Company, Inc., correspond identically to two entries classed as "L/R Hotel Syracuse, Inc." in BMDC's Period Summary of Postings for the period ending December 31, 1994. The amounts and dates of the other five checks evidencing the Renovation Loans correspond identically to five entries classed as L/R– Hotel Syracuse (MAB Associates) in BMDC's Period Summary of Postings for the period ending December 31, 1995. *See Exhibit F to Affidavit of Manny A. Alas, Sworn to December 11, 1996.*

 Reasonable minds could not find the correlation of checks to BMDC's period summaries of postings to be a coincidence. Allegro has not offered any testimony or other evidence to show that the Renovation Loans were properly owed to the Bennett Processing Company, or to show that they should not be repaid to BMDC. The fact that the checks were issued by the Bennett Processing Company, Inc., in the absence of any specific evidence submitted by Allegro on this issue, is at best colorable support for Allegro's position. Evidence submitted by the non-movant which is merely "colorable (sic) conclusory, speculative or not significantly probative" does not warrant denial of a summary judgment motion. *See Rodriguez v. City of New York,* 931 F.Supp. 209 (S.D.N.Y.1996) (*citing Knight v. United States Fire Ins.,* 804 F.2d 9, 12–15 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)), *aff'd,* 112 F.3d 505 (2d Cir.1997). Based upon the foregoing, and because entry of an advance on corporate books is sufficient to evidence an intercompany loan, *see Hillsborough Holdings Corp. v. The Celotex Corp. (In re Hillsborough Holdings Corp.),* 166 B.R. 461, 475 (Bankr.M.D.Fla.1994), *aff'd,* 176 B.R. 223 (M.D.Fla.1994). Allegro's argument concerning the checks issued by the Bennett Processing Company, Inc. does not raise a genuine issue of material fact.

The same is true with respect to the checks issued by "Aloha Leasing." These checks evidence the advancement of funds in connection with the 16 BMDC Leases, aggregating $3,960,137. Each of these checks contain in the upper left corner the words "The Bennett Funding Group, Inc." Immediately below are the capitalized words "ALOHA LEASING." According to Alas, Aloha Leasing is a division of BFG. *See Alas Affidavit, at ¶ 12.* These checks evidence obligations which were initially owing from HSI to Aloha Leasing, or to BFG, and as such, would not

have been issued by BMDC. The fact that the obligations evidenced by the 16 BMDC Leases are now owed to BMDC is evidenced by the bookkeeping entries made by BFG and BMDC in October 1994, as discussed above.

*Consideration Received and the Immateriality of Allegro's Claims*

 Whether BMDC received reasonably equivalent value/fair consideration is a question of fact as to which the Court has considerable latitude to make a determination based upon all of the facts and circumstances of the case. *See Lipshie v. Wise (In re Wise),* 119 B.R. 392, 394 (E.D.N.Y.1990) (citing, among other cases, *Rosen v. Barclays Bank of New York,* 115 B.R. 433 (E.D.N.Y. 1990)); *United States v. McCombs,* 30 F.3d at 326; *Klein v. Tabatchnick,* 610 F.2d 1043, 1047 (2d Cir.1979). " '[T]he recognized test is whether the [transfer] conferred any *economic* benefit on the debtor ...' " *Morris v. Midway Southern Baptist Church (In re Newman),* 183 B.R. 239, 246–47 (Bankr. D.Kan.1995) (quoting *Butler Aviation Internat'l, Inc. v. Whyte (Matter of Fairchild Aviation Corp.),* 6 F.3d 1119, 1127 (5th Cir. 1993)), *aff'd,* 203 B.R. 468 (D.Kan.1996); *see also In re 375 Park Ave. Assocs., Inc.,* 182 B.R. 690, 695–96 (Bankr.S.D.N.Y.1995) (*citing Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991–993 (2d Cir.1981)). Summary judgment may therefore be appropriate in cases where the consideration was far below the actual worth of the asset exchanged. *See, e.g., In re Wise,* 119 B.R. at 394 (affirming bankruptcy court's grant of summary judgment and noting disparity between asset's sale price of $120,000 and its appraised value of between $167,000 and $280,000); *In re Newman,* 11 B.R. 628, 632–34 (Bankr.S.D.N.Y.) (summary judgment granted where debtor transferred $40,000 note in exchange for note with discounted value of less than $12,500), *aff'd* 15 B.R. 658 (S.D.N.Y.1981). It naturally follows that a grant of summary judgment is appropriate where no consideration is received for the transfer in question. *See In re Harvard Knitwear, Inc.,* 193 B.R. at 396–97.

It is difficult to quantify with precision the value of BMDC's property which was trans-ferred in this case. The Assumed Obligations, despite having been assumed by Olympus, remain the legal obligations of MAB and HSI, as the case may be. It is clear that

> "[O]ne who owes money or is bound to any performance whatever, cannot by any act of his own, or by any act in agreement with any other person, except his creditor, divest himself of the duty and substitute the duty of another. 'No one can assign his liabilities under a contract without the consent of the party to whom he is liable.' This is sufficiently obvious when attention is called to it, for otherwise obligors would find an easy practical way of escaping their obligations ..."

*Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 924 (2d Cir.1977) (quoting 3 Williston on Contracts § 411 (3d ed.1960) (footnote omitted)). Thus, delegation of a contractual obligation "does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable." *Id.* (citing *Davidson v. Madison Corp.,* 257 N.Y. 120, 125, 177 N.E. 393, 394 (1931) and *Devlin v. City of New York,* 63 N.Y. 8, 16 (1875); *see also Smith v. Morin Bros.,* 253 N.Y.S. 368, 371, 233 A.D. 562 (4th Dep't 1931). Legally speaking, MAB and HSI remain obligated on the Assumed Obligations, and those Obligations therefore cannot be said to have been transferred within the meaning of Code § 548 or NYD&CL. The assumption of the Assumed Obligations by Olympus was, however, integral to effectuating a transfer of the secured debt owing to BMDC.

It would appear that BMDC exchanged, *inter alia,* the secured $8 Million Obligation for the secured $16.2 obligation, which would appear to be a net benefit inuring to BMDC. However, the Amended and Restated Note expressly purports to amend and restate four notes in the aggregate original principal amount of $16,050,000 which Allegro maintains were discharged by the HSI Confirmation Order. It therefore does not appear that the Sale affected the $8 Million Obligation or the lien on the Hotel securing that obligation. To the extent that the Amended

and Restated Note can be interpreted as amending and restating the $8 Million Obligation, BMDC did not receive consideration because the Sale was structured to ensure that payment of *any* of the Assumed Obligations would result in a corresponding reduction of the secured debt owing to BMDC.

It must be remembered that neither the Amended and Restated Note nor the $16.2 Million Mortgage were enforceable until Allegro had received at least $9.7 million under the Olympus Lease. The evidence in the record indicates that the Sale was structured to ensure that the $9.7 million would come, not from Olympus, but from BMDC. It can fairly be said that Olympus entered into the Lease knowing that it would not perform thereunder. The Lease is dated March 1, 1996, and yet Olympus was in default as of that date. Thus, BMDC was immediately called upon to honor its Guaranty. By April 1996, Allegro and Olympus had executed an Agreement for Surrender of Lease. *See Exhibit D to Declaration of Jonathan Rosenberg submitted under cover of Notice of Motion.* It is curious, to say the least, that Allegro entered into the Lease with Olympus and proceeded with the transaction despite the fact that Olympus' intention and/or ability to perform under the Lease was at best questionable on March 1, 1996. As of March 1, 1996, the reality appears to have been that Olympus would not perform under the Lease and that BMDC was faced with paying $9.7 Million to Allegro over three years before it could enforce the Amended and Restated Note or the $16.2 Million Mortgage. On this basis, the value of the Amended and Restated Note and $16.2 Million Mortgage would actually have been no more than $6.5 million on March 1, 1996.

But the value of the Amended and Restated Note would actually have been less than $6.5 million due to the offset provision in the Amended and Restated Note. Olympus had agreed to satisfy the Assumed Obligations. As discussed above, the evidence is that Olympus had little, if any, ability and/or intention to perform under the Lease on March 1, 1996, and it is therefore reasonable to conclude that Olympus would not perform under the Assumption Agreement. As discussed above, BMDC was not a party to the Assumption Agreement, and could still look to MAB or HSI, as the case might have been, for payment of the Assumed Obligations. However, any such payments by MAB or HSI would have triggered a corresponding reduction of the amount due under the Amended and Restated Note by operation of the offset provision contained therein.

Therefore, as of March 1, 1996, although BMDC was still owed the Assumed Obligations, payment of *any* of those Obligations would have correspondingly reduced the amount of secured debt owed to BMDC. The Assumed Obligations exceeded $9.8 million on March 1, 1996, so even if BMDC did receive the $3.6 million payment discussed above, that fact would not be material to disposition of the Trustee's Motion. Similarly, if BMDC received the $3.9 million payment on account of the $8 Million Obligation as claimed by Allegro, that fact would not be material. As long as BMDC was owed $1.00 of secured debt and $1.00 of unsecured debt immediately prior to the Sale, it stood to lose the $1.00 of secured debt by virtue of the offset provision contained in the Amended and Restated Note.

Allegro concedes that, immediately before the Sale, the Hotel had a liquidation value of at least $6,300,000, based upon the Hotel's liquidation value following confirmation of the Plan. *See Allegro's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, etc., filed October 21, 1996, p. 13.* While the Trustee maintains that Hotel has been substantially renovated since confirmation of the Plan, there is no evidence in the record concerning the value of the Hotel as of the date of the Sale, other than the $6.3 liquidation value. Assuming that the $8 Million Obligation was replaced by the Amended and Restated Note, BMDC effectively lost property, the value of which was equal to the amount of the outstanding Assumed Obligations, up to at least $6.3 Million. BMDC effectively received nothing in this process and therefore did not receive sufficient consideration in connection with the Sale.

On the foregoing basis, the Court is constrained to conclude that, at a minimum,

some portion of BMDC's secured debt was transferred with actual intent to hinder, delay and defraud its creditors within the meaning of Code § 548(a)(1) and NYD&CL § 276. The Court recognizes the general policy against granting summary judgment based upon a finding of actual intent and the reasons underlying that policy. The Court also recognizes that actual fraudulent intent must be proven by clear and convincing evidence. *See HBE Leasing Corp. v. Frank,* 48 F.3d at 639. In this case, however, there is simply no room for any other conclusion but that the transfer of BMDC's secured debt occurred with actual fraudulent intent.

BMDC's actual fraudulent intent is evidenced by the unusual structure of the Sale, particularly the inter-relationship of the documents executed in connection therewith which adversely affected BMDC and its creditors. *See HBE Leasing Corp. v. Frank,* 48 F.3d at 639 (stating that actual fraudulent intent may be inferred from the unusualness of the transaction) (citing *United States v. McCombs,* 30 F.3d at 328); *Graham v. Lennington,* 74 B.R. 963, 965–66 (S.D.Ind.1987) (affirming bankruptcy court's finding, under Indiana law, of actual fraud based upon unusualness of transaction). At bottom, it is clear that the transfer of BMDC's secured debt was part of, and facilitated, a larger transaction designed to transfer to Allegro control of what was to become an unencumbered Hotel for as little as approximately $1.8 Million, within approximately one month of the collapse of what is alleged to be the largest Ponzi scheme in U.S. history. It is noteworthy that Allegro generally has not attempted to defend the structure of the Sale, nor its potential for adversely affecting BMDC and its creditors. Rather, Allegro has focused most of its efforts on trying to establish that, essentially, BMDC did not have property which could be adversely affected by the Sale. As discussed above, those efforts have been unsuccessful. Fur-

thermore, actual intent may be inferred from a lack of consideration, *see, e.g., Atlanta Shipping Corp., Inc. v. Chemical Bank,* 631 F.Supp. at 347 (citation omitted), and Allegro has failed to present any evidence that BMDC received adequate consideration. Based upon the foregoing, the transfer of BMDC's property was fraudulent within the meaning of Code § 548(a)(1) and NYD&CL § 276.

Whatever argument can be mustered that the transfer of BMDC's property was not actually fraudulent within the meaning of Code § 548(a)(1) and NYD&CL § 276 is largely irrelevant in light of the fact that the same transfer is constructively fraudulent within the meaning of Code § 548(a)(2) and NYD&CL § 273. The Trustee has satisfied all of the elements of constructive fraud under Code § 548(a)(2) and NYD&CL § 273. In fact, the only element thereunder seriously disputed by the Allegro concerns consideration, which, as discussed above, was insufficient. Therefore, the transfer of BMDC's property was fraudulent within the meaning of Code § 548(a)(2) and NYD&CL § 273.

*Relief*

The Trustee's Motion seeks an order that, *inter alia,* title to the Hotel be delivered to him. Subsequent to the filing of the Motion, however, the Trustee conceded that "[i]f the Court avoids the sale of the Hotel Syracuse, title to the Hotel will revert to ... MAB." *See Trustee's Memorandum of Law, filed October 2, 1996, p. 2 n.1.* It would appear that the Trustee seeks, *inter alia,* an order that Allegro return the MAB stock to Michael A. Bennett to allow for a consensual foreclosure of BMDC's lien on the Hotel.[23] In this case, the property transferred within the meaning of Code § 548 was not the Hotel or the MAB stock, but rather obligations which were owing to BMDC, and it is therefore questionable whether the Court has the

---

23. In his October 2, 1996 Memorandum of Law, the Trustee, still unaware of the HSI bankruptcy, asserted that "Michael Bennett, as sole shareholder of MAB, has acknowledged that MAB is in default under certain note obligations to BMDC and has stated, through his counsel, that upon the avoidance of the sale he will transfer title to the Hotel Syracuse to BMDC and execute a con-

sent judgment in favor of BMDC for the amounts due and owing on the notes." The notes referred to by the Trustee were, among others, the ones which were to be recast and restructured into the $8 Million Obligation. There is no evidence in the record that the $8 Million Obligation was or is in default.

power to order Allegro to return the MAB stock to Michael A. Bennett.[24]

■ Code §§ 548 and 550, operating together, allow for the avoidance and recovery of transfer of an interest of the *debtor* in property, which in this case does not include the MAB stock. *See 11 U.S.C. §§ 548, 550.* There is admittedly an emerging trend of analyzing multi-component transfers as a single transaction for fraudulent transfer purposes. *See HBE Leasing Corp. v. Frank,* 48 F.3d at 623 (citations omitted); *In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990) (citations omitted). For example, in cases involving a leveraged buyout, a series of transactions will often be collapsed into one transaction for purposes of determining whether the elements of a fraudulent transfer cause of action can established. *See, e.g., CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.),* 145 B.R. 131, 137 (Bankr.S.D.N.Y.1992) (citations omitted). It does not follow, however, that the transfer of non-debtor property can be avoided as a result of having been transferred as part of a transaction in which separate debtor property was fraudulently transferred. One court has recognized that "[o]ne of the murkiest areas of fraudulent transfer law as applied to LBOs is what remedy to apply when the plaintiff prevails." *In re Best Products Co., Inc.,* 168 B.R. 35, 57 (Bankr.S.D.N.Y.1994) ("discussing appropriate remedies in context of LBO"), *appeal dismissed,* 177 B.R. 791 (S.D.N.Y.1995), *aff'd,* 68 F.3d 26, 28 (2d Cir. 1995). Likewise, the applicable remedy to be used in the instant case is not readily apparent.

■ The Court recognizes that, in a fraudulent transfer action, a "court may be called upon to exercise its equity powers in attempting to unravel and repair the wrongs thus charged...It is a situation equitable in its nature and the allegations of both complaints strongly appeal to the conscience of the court for the application of the maxim that 'fraud vitiates everything.'" *See Peckham v. Family Loan Co.,* 212 F.2d 100, 107 (5th Cir.1954). Despite the Court's equitable

powers, "there is no general power of avoidance vested in the bankruptcy court." *Palmer & Palmer, P.C. v. United States Trustee (Matter of Hargis),* 887 F.2d 77, 79 (5th Cir.1989) (discussing impropriety of avoiding under Code § 549 debtor's transfer of non-estate funds to lawyers for rendition of pre-petition services), *clarified on reh'g,* 895 F.2d 1025 (5th Cir.1990). "The reach of [a trustee's] avoidance power [under Code § 550] is limited to transfers of 'property of the debtor.'" *Jenkins v. Chase Home Mortgage Corp. (Matter of Maple Mortgage Inc.),* 81 F.3d 592, 595 (5th Cir.1996) (citing *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990)). The Trustee has not expressly argued that the separateness of Michael A. Bennett, MAB and/or BMDC should be disregarded under an alter ego theory so that Michael A. Bennett's MAB stock should be considered to be BMDC property, and there is insufficient evidence in this record to do so. *See generally Green v. Bate Records, Inc. (In re 10th Ave. Record Distributors, Inc.),* 97 B.R. 163 (S.D.N.Y. 1989) and *Keene Corp. v. Coleman, (In re Keene Corp.),* 164 B.R. 844, 850 n. 6 (Bankr. S.D.N.Y.1994) (each involving attempts to recover a fraudulent transfer utilizing an alter ego theory).

The Court has found little authority indicating that a trustee has standing to avoid transfers of non-debtor property for the benefit of non-debtors. To the extent that BMDC lacks an interest in the MAB stock, the Court lacks subject matter jurisdiction over the stock. *See Shepard v. United States (Matter of Potomac Systems Engineering, Inc.),* 202 B.R. 632, 633 (Bankr. N.D.Ala.1996). Even if the general creditors of BMDC's estate would somehow be benefitted by a return of the MAB stock to Michael A. Bennett, the Court could only exercise "related-to" jurisdiction over the stock. *See Dally v. Bank One, Chicago, N.A. (In re Dally),* 202 B.R. 724, 728 (Bankr.N.D.Ill. 1996). Therefore, the Court will not order Allegro to return the MAB stock to Michael A. Bennett. *Cf. In re Joshua Slocum Ltd.,*

---

**24.** The Court takes judicial notice that, since the filing of the Trustee's Motion, Michael A. Bennett has filed a voluntary petition for relief under chapter 7 of the Code in the Southern District of Florida.

922 F.2d 1081, 1095 (3d Cir.1990) (*Sloviter, J., dissenting*) (suggesting that appeal was moot because "the only way we can provide relief here is to annul a transaction which involves an entity over which we do not have jurisdiction.").

 To the extent that the Amended and Restated Note replaced the $8 Million Obligation following the Sale, the appropriate remedy in this case is to void the Amended and Restated Note, the $16.2 Million Mortgage and the Guaranty, and to reinstate the $8 Million Obligation and the lien on the Hotel securing that Obligation.[25] Presumably, MAB will pay the $8 Million Obligation, or the Trustee will commence foreclosure proceedings on the Hotel. Because BMDC never owned the Hotel or the MAB stock, it is neither entitled to an injunction prohibiting Allegro from transferring or disposing of Hotel profits and revenue, nor an order of attachment against Allegro's assets located in New York. Likewise, BMDC is not entitled to an accounting of Hotel profits and revenue.

Therefore, based upon the foregoing, the Trustee's Motion is granted in part and denied part in accordance with the foregoing discussion, and, there being no just reason for delay, it is

ORDERED, that the $8 Million Obligation is in full force and effect and owing from MAB to BMDC, on the terms set forth in the HSI Plan; and it is further

ORDERED, that BMDC shall have a lien on the Hotel securing payment of the $8 Million Obligation; and it is further

ORDERED, that the Amended and Restated Note, the $16.2 Million Mortgage and the Guaranty, are void; and it is further

ORDERED, that, pursuant to Fed. R.Civ.P. 54(b), a final judgment be entered in the Trustee's favor consistent with the foregoing.[26]

25. It is therefore unnecessary to address Allegro's contention that, if it is divested of control of the Hotel, it is entitled to a lien on the Hotel pursuant to Code § 548(c).

26. The Court's determination that there is no just reason for delay in entering final judgment on the Trustee's claim is based upon a finding that such claim implicates questions of fact and law which are largely different from the questions of fact and law upon which the other claims and counterclaims in this adversary proceeding are based. For example, Allegro's counterclaim for fraud in the inducement clearly involves facts and legal issues distinct from those in question here. Whatever the viability of Allegro's counterclaim for breach of the Guaranty may be in light of this Decision, that too involves questions of fact and law which are, mostly, distinct from those in question here. Further, Allegro's counterclaims seek money damages from BMDC, while the Trustee's claim essentially seeks the reinstatement of, *inter alia*, obligations said to be owing from MAB and HSI. Thus, the Trustee's claim can be enforced separately from Allegro's counterclaims. *See General Accident Ins. Co. v. J.K. Chrysler Plymouth Corp.*, 139 F.R.D. 585, 587 (E.D.N.Y.1991) (citing *Cullen v. Margiotta*, 811 F.2d 698, 711 (2d Cir.1987), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) for the proposition that "[i]n a case involving multiple claims, the court should not enter final judgment dismissing a given claim unless that claim is separable from the claims that survive ..." and that "[c]laims are normally regarded as separable if they involve at least some different questions of fact and law and could be separately enforced.").